O'Connor, C.J.
*422 {¶ 1} This is an appeal of right from aggravated-murder convictions and death sentences. An Erie County Common Pleas Court jury found appellant, Curtis Clinton, guilty of the aggravated murders of 23-year-old Heather Jackson and her two children, three-year-old C.J. and one-year-old W.J., as well as other offenses, and unanimously recommended a sentence of death. The trial court accepted the recommendation and sentenced Clinton accordingly.
{¶ 2} We affirm Clinton's convictions and sentences.
I. Trial Evidence
{¶ 3} Evidence introduced at trial showed that Clinton raped 17-year-old E.S. on September 2, 2012, at his Sandusky apartment. Less than a week later, Clinton strangled Jackson, C.J., and W.J. in Jackson's Sandusky home. Forensic evidence also established that he raped C.J. at or about the time of her death.
A. Rape of E.S.
{¶ 4} Over the Labor Day weekend in 2012, E.S. visited her former neighbor, Mercedes Charlton. Clinton and Charlton were friends, but E.S. had never met Clinton. On Friday, August 31, Clinton picked up Charlton and E.S. and drove them to his apartment in Sandusky, where they spent the next few days.
{¶ 5} On the evening of September 2, Clinton and E.S. went to a local bar, while Charlton remained at the apartment. Clinton tried to put his arm around E.S. at the bar, and she moved away from him. E.S.
*15 told Clinton that he made her feel uncomfortable and that she wanted to go home.
{¶ 6} Around 3:00 a.m. on September 3, they returned to Clinton's apartment. E.S. tried to call her boyfriend to get a ride home, but he did not answer. She heard Clinton and Charlton arguing, and then Clinton and Charlton left the apartment. Clinton returned alone about 15 minutes later. E.S. was lying on the *423 couch, and Clinton went over to her and started choking her. E.S. was able to twist away from him and stand up, but then he placed her in a headlock. E.S. said, "Please don't hurt me." He walked her to the bedroom and ordered her to remove her clothes and get on the bed. Clinton raped her vaginally and then choked her until she passed out. When E.S. woke up, Clinton raped her again. E.S. asked him to stop, but he refused.
{¶ 7} Later, Clinton allowed E.S. to dress, and he drove her home, where E.S. told her mother that she had been raped. E.S.'s parents took her to the hospital.
{¶ 8} Lisa Dettling, a nurse at St. Vincent's Medical Center in Toledo who is trained in examining sexual-assault victims, examined E.S. E.S. reported that Clinton had raped her and described what had happened. Dettling observed redness on E.S.'s neck that was consistent with her having been choked.
{¶ 9} The Ohio Bureau of Criminal Identification and Investigation ("BCI") conducted DNA testing of vaginal and anal swabs taken during E.S.'s exam. That testing identified a DNA profile consistent with Clinton's. The BCI report concluded that "the expected frequency of occurrence of the DNA profile from the sperm fraction of the vaginal swabs * * * and the anal swabs * * * is 1 in 5,074,000,000,000,000,000 unrelated individuals."
B. Murder of Heather Jackson and Her Children
{¶ 10} In September 2012, Jackson was living in Sandusky with C.J. and W.J.
1. Events on the Night of the Murders
{¶ 11} Several of Jackson's friends visited her at her home on the night of Friday, September 7, and into the next morning. Between 6:00 p.m. and 8:00 p.m., Justin Kromer and Jackson watched TV together, and then he went home. Joshua Case and Thomas Hanson arrived, separately, around 9:30 p.m. Hanson talked with Jackson and saw her two children on the couch and left around 10:00 p.m. Case spent much of the night at Jackson's. He had sexual intercourse with Jackson but left around 1:00 a.m., when a friend, Billy Crawford, picked him up at Jackson's home.
{¶ 12} Around 3:00 a.m., Kromer texted Jackson and asked whether she was home. She replied, "Yeah. Why?" He texted back that he "want[ed] to hang out with" her, but she did not reply. Kromer called her a few times after that, but those calls went directly to voicemail.
{¶ 13} Phone records showed that Jackson called Case at 3:05 a.m. However, Case later testified that he was "pretty intoxicated" at that time and did not remember that call.
*424 2. Bodies Discovered
{¶ 14} At 2:30 p.m. on September 8, Danielle Sorrell, a close friend of Jackson, went to Jackson's residence but left after no one answered her knock at the door. After receiving a voicemail from Jackson's mother indicating that Jackson was missing, Sorrell returned around 5:00 p.m. She found the doors locked, and again, no one answered when she knocked. Sorrell opened a window and heard the TV but saw no one, and eventually she left.
*16 {¶ 15} Around 7:30 p.m., Hanson and Dan Risner went to Jackson's house after hearing that she was missing. They knocked on the front door, and no one answered. Risner went to the back porch, forced open the door, and entered the home. The men found Jackson's body in her bedroom. They left, and Risner called 9-1-1.
{¶ 16} Sergeant Eric Graybill, a Sandusky police officer, responded to Jackson's residence and entered the home. He found Jackson's body wedged between the box spring and mattress in her bedroom with a ligature around her neck. Police found the bodies of Jackson's two children behind stacked boxes inside a utility closet. Each victim had a ligature around the neck.
3. Beginning of Murder Investigation
{¶ 17} Police found no signs of forced entry at Jackson's home. They interviewed Kromer, Case, Crawford, Hanson, and others who were with Jackson on September 7 and 8. The phone records of these individuals and surveillance tapes from Firelands Hospital, which is so close to Jackson's home that its cameras recorded the outside of Jackson's home and the approaching street, helped eliminate these individuals as suspects.
{¶ 18} Phone records showed that two of the last calls Jackson received on September 8 were from a phone number assigned to Clinton. One call was received at 3:00 a.m. and lasted 182 seconds. The second call, at 3:12 a.m., lasted 38 seconds. All of the calls to Jackson after that went to her voicemail or were unanswered.
{¶ 19} The officer who reviewed the videos from Firelands Hospital testified that it showed a white Cadillac arriving at Jackson's home at 3:10 a.m. and departing at 4:16 a.m. on September 8. The Cadillac returned to Jackson's home at 4:20 a.m. and left a minute and a half later. Detective Ken Nixon, who had investigated the rape of E.S., knew that Clinton drove a white Cadillac. Nixon notified the other investigators and suggested that they start looking for Clinton.
4. Clinton's Police Interview
{¶ 20} On September 10, Nixon learned that Clinton had been admitted to Bellevue Hospital as a suicidal person. Nixon and Sergeant Newell went that *425 morning to see Clinton at the hospital. Clinton, who was being discharged, agreed to go with them to the Sandusky police department.
{¶ 21} At 11:06 a.m., Detective Gary Wichman conducted a videotaped interview of Clinton. Clinton acknowledged his Miranda rights and signed a waiver-of-rights form. See Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Clinton said that he had heard that Jackson had been shot.
{¶ 22} Clinton said that he had been seeing Jackson for five months and that they had had a sexual relationship. He said that Jackson had a lot of problems and sought his financial and emotional support but that he did not know Jackson's children well. He first said that he had last seen Jackson on Thursday, September 6, when they talked, he gave her $328, and they had sex. He stated that on the evening of September 7, he had gone to see Charlton, who was in Clyde.
{¶ 23} Wichman informed Clinton that phone records showed that he had talked to Jackson early Saturday morning, September 8. Clinton said he had had his days mixed up and that it had not been Thursday night but instead Friday night or early Saturday morning that he had last seen Jackson. He said he had not stayed long at her house; he had dropped the money off, and they had had sex. He said, "I did my thing and left." He was not sure what time he arrived home.
*17 {¶ 24} Clinton said that someone else must have gone to Jackson's house after he left. He said that while he was with Jackson, she mentioned that somebody had texted or called her and she seemed irritated.
{¶ 25} Clinton said, "I didn't do nothing to her and no, I didn't do nothing to her kids so that's my statement." When informed that he was the last person to have had contact with Jackson, Clinton said, "I don't think so. I doubt it. I really doubt it." Clinton added, "If something happened, I don't remember it." He later repeated, "I ain't done nothing."
5. Clinton's Phone Call with his Mother from Jail
{¶ 26} Clinton was arrested and incarcerated in the county jail. On September 11, 2012, Clinton called his mother from the jail on a recorded phone line. Excerpts of that conversation were played during trial. Clinton told his mother that he was "confused" and wished that he had sought help. He also said, "You should know it would happen again. * * * Now it's even worse than before." Clinton stated, "I just lose it. * * * I don't know what it is." His mother responded, "I know. We all have that issue, but we have learned how to deal with it." She said, "[W]e should have really just forced you to go back to your medication." Clinton replied, "I thought I was just over it * * * I just wouldn't believe that shit would happen no more." Then Clinton said, "I'm going to go in there and plead guilty or whatever, and just let them do whatever * * *."
*426 6. Other Evidence Implicating Clinton
{¶ 27} Police searched Clinton's car and apartment. In the car, they found Clinton's wallet, which contained his debit card. Receipts found in Clinton's living room documented two transactions using his debit card at an ATM less than a mile and a half from Jackson's home at 4:30 a.m. and 4:31 a.m. on Saturday, September 8. Security footage from the bank showed his car pulling up to the ATM at that time.
7. Autopsy Results
{¶ 28} Dr. Diana Scala-Barnett, deputy coroner for Lucas County, conducted the autopsies of the three victims. She concluded that Jackson died from ligature strangulation. She noted that Jackson's rectum was "more open than it normally is after death," which she said indicated that "something was most likely introduced in there to keep it open like that" at or about the time of her death.
{¶ 29} Dr. Scala-Barnett testified that both W.J. and C.J. also died from ligature strangulation. She noted that C.J.'s underwear was "rolled" up, indicating that the body had been re-dressed. C.J. also had a rectal dilation similar to her mother's, again indicating that something was in her rectum at "or about the time of death.''
8. DNA and Forensic Evidence
{¶ 30} Julie Cox, a forensic scientist at BCI, testified that seminal fluid was detected on the anal swabs obtained from C.J. Cox also noticed a stain in C.J.'s underwear, so she cut a very small portion of that stained area for testing and determined that it contained a sperm cell.
{¶ 31} Hallie Garofalo, a forensic scientist in the DNA unit at BCI, determined that there was a mixture of DNA on the anal swabs from C.J. The major DNA profile was consistent with C.J.'s, and the minor profile was consistent with Clinton's, as was the Y-chromosome profile from that sample. Garofalo testified that the "combined expected frequency of occurrence of these DNA profiles"-from both DNA tests-"on the anal swabs is one in 120,094,500 unrelated individuals." The DNA found on the stain in C.J.'s underwear and on the swabs taken of C.J.'s ankles and left wrist was a mixture consistent with contributions *18 from Clinton, Jackson, and C.J. The major DNA profile from the swab taken of C.J.'s left ankle was consistent with Clinton's DNA profile, and the expected frequency of occurrence of that DNA profile is 1 in 5,074,000,000,000,000,000 unrelated individuals.
{¶ 32} Garofalo stated that the DNA profile obtained from the ligature on W.J. was a mixture consistent with contributions from Clinton, Jackson, and W.J. The *427 proportion of the population that cannot be excluded as possible contributors to the mixture is 1 in 55,930 unrelated individuals.
{¶ 33} DNA found on Jackson's right wrist was a mixture consistent with contributions from Clinton and Jackson.
II. Procedural History
{¶ 34} The state charged Clinton with five counts of aggravated murder, three counts of rape, and one count of aggravated burglary. Count Three charged him with the aggravated murder of Jackson while committing a rape and/or aggravated burglary. Count Four charged him with the aggravated murder of C.J. while committing a rape, and Count Five charged him with the aggravated murder of C.J., a child under the age of 13. Count Seven charged him with the aggravated murder of W.J. while committing a rape and/or aggravated burglary, and Count Eight charged him with the aggravated murder of W.J., a child under the age of 13.
{¶ 35} All the aggravated-murder counts contained death-penalty specifications for committing aggravated murder while committing or attempting to commit kidnapping, rape, aggravated arson, aggravated robbery, or aggravated burglary, R.C. 2929.04(A)(7), and for a course of conduct involving multiple murders, R.C. 2929.04(A)(5). Counts Four, Five, Seven, and Eight also each contained a death-penalty specification for the murder of a child under the age of 13, R.C. 2929.04(A)(9).
{¶ 36} Regarding the four additional counts, Count Six charged Clinton with the rape of C.J., Count Nine charged him with aggravated burglary, and Counts One and Two charged him with the rape of E.S.
{¶ 37} Clinton pled not guilty to all the charges. The jury found Clinton guilty of all the charges and specifications, and it recommended that he be sentenced to death. The trial judge sentenced him to death on each of three of the counts of aggravated murder (two of the aggravated-murder counts were merged for sentencing). He was also sentenced to ten years in prison for each count of raping E.S. The sentences for the crimes committed against E.S. were ordered to run concurrently with each other and consecutively to the sentences imposed for the aggravated-murder convictions. Clinton was also sentenced to life in prison without parole for the rape of C.J. and ten years for aggravated burglary. Those sentences were ordered to run concurrently with each other and with the other sentences imposed in the case.
III. Issues on Appeal
{¶ 38} Clinton appeals his convictions and sentences and raises 23 propositions of law. Many of the propositions are subject to a plain-error analysis because they *428 allege errors to which Clinton's defense counsel failed to object at trial. We will address these propositions first, followed by the propositions raising claims of ineffective assistance of trial counsel. The issues raised in the remaining propositions will be addressed in the approximate order in which they arose during trial.
A. Plain-Error Issues
{¶ 39} Clinton raises numerous objections on appeal that he did not raise at trial. We review these claims only for *19 plain error. State v. Mammone , 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 69. To prevail, Clinton must show that an error occurred, that the error was plain, and that but for the error, the outcome of the trial clearly would have been otherwise. Id. , citing State v. Barnes , 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).
{¶ 40} In numerous propositions, Clinton fails to show that plain error occurred. These include proposition of law No. V (prosecutor violated Clinton's due-process rights by authorizing the total consumption of DNA evidence without notifying the defense); proposition of law No. VI (pretrial publicity denied Clinton his right to fair trial by biasing jurors); proposition of law No. VII (trial court erred by failing to excuse prospective jurors based upon their connections to the police, other jurors, a witness, and an assistant prosecutor); proposition of law No. IX (trial court erred by admitting inflammatory crime-scene and autopsy photos during the guilt phase of trial); proposition of law No. X (trial court erred in admitting a portion of Clinton's videotaped statement to police); proposition of law No. XI (trial court improperly admitted opinion testimony from retired detective Michael Clark); proposition of law No. XIII (Clinton's right to privileged attorney-client communications and due process were violated when his discussions with his counsel were broadcast over a closed-circuit video feed); proposition of law No. XIV (prosecutor peremptorily challenged a prospective juror because of her race in violation of Batson v. Kentucky , 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) ); proposition of law No. XV (trial court erred by permitting improper testimony, made erroneous evidentiary rulings, and erred in overruling defense motions and objections); and proposition of law No. XVII (prosecutor committed misconduct during closing argument). In each of these instances, Clinton failed to prove that any of the alleged errors prejudiced him by affecting the outcome of the trial, based on the overwhelming evidence of guilt, including DNA evidence. There was no plain error.
B. Ineffective-Assistance Allegations
{¶ 41} Clinton's ineffective-assistance claims in proposition of law No. XVI also lack merit. Reversal of a conviction for ineffective assistance of counsel requires the defendant to show first that counsel's performance was deficient and second that the deficient performance prejudiced the defense, depriving the defendant of *429 a fair trial. Strickland v. Washington , 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ; State v. Bradley , 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. Specifically, Clinton alleges that his trial counsel (1) failed to present a complete defense through examination of the state's witnesses, (2) failed to ensure that Clinton's waiver of the presentation of mitigation evidence was knowing and voluntary, (3) failed to ensure that Clinton was present at all critical proceedings, (4) failed to object to unqualified expert testimony, (5) failed to properly challenge and/or voir dire jurors, (6) failed to ensure that a cautionary instruction was provided to jurors, (7) failed to effectively argue for a change of venue, (8) failed to hire a forensic pathologist or DNA expert, (9) failed to object to the allegedly improper admission of photos, (10) failed to assist Clinton in preparing his unsworn statement, (11) failed to present Clinton's testimony in his case-in-chief, (12) failed to object to the admission of Clinton's involuntary statement, (13) failed to object to the admission of the recording of Clinton's phone call with his mother, (14) failed to request voir dire of spectators who may have overheard attorney-client conversations through a closed-circuit video feed on the first day of Clinton's trial, (15) failed to *20 object to the continuing presence of Jackson's brother and its prejudicial impact on jurors, (16) failed to sufficiently argue that the trial court should have dismissed the rape count and specifications concerning C.J. and E.S. pursuant to Crim.R. 29, (17) failed to put on mitigating evidence, (18) failed to have a mitigation theory prior to voir dire, (19) failed to challenge inaccurate captions on video evidence, (20) failed to object to improper testimony by the coroner, (21) failed to object to improper victim-impact testimony, (22) failed to object to improper closing arguments, and (23) failed to object to court costs. Clinton also alleges cumulative ineffective assistance. We do not find that any of the alleged failures by Clinton's trial counsel resulted in prejudice that deprived Clinton of a fair trial, particularly given the overwhelming evidence of his guilt.
C. Pretrial Issues
1. Joinder
{¶ 42} In proposition of law No. IV, Clinton argues that the trial court erred by failing to grant the defense's motion to sever the rape charges as to E.S. in Counts One and Two from the unrelated charges of aggravated murder, rape, and aggravated burglary as to Jackson, C.J., and W.J.
{¶ 43} "Two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged * * * are of the same or similar character." Crim.R. 8(A). Crim.R. 8(A) also allows the joinder of offenses that "are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal *430 conduct." Permitting joinder "conserves resources by avoiding duplication inherent in multiple trials and minimizes the possibility of incongruous results that occur in successive trials before different juries." State v. Hamblin , 37 Ohio St.3d 153, 157-158, 524 N.E.2d 476 (1988).
{¶ 44} "Notwithstanding the policy in favor of joinder," Crim.R. 14 permits a defendant to request severance of the counts in an indictment "on the grounds that he or she is prejudiced by the joinder of multiple offenses." State v. LaMar , 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 49. The defendant "has the burden of furnishing the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial." State v. Torres , 66 Ohio St.2d 340, 343, 421 N.E.2d 1288 (1981). But even if the equities appear to support severance, the state can overcome a defendant's claim of prejudicial joinder by showing either that (1) it could have introduced evidence of the joined offenses as "other acts" under Evid.R. 404(B) or (2) the "evidence of each crime joined at trial is simple and direct." State v. Lott , 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990).
{¶ 45} In his motion for severance, Clinton argued that if the state proved the charges alleging that Clinton raped E.S., the jury would likely find that he also raped C.J. Clinton also argued that the jury might use the allegations that he had raped E.S. as nonstatutory aggravating factors in determining whether to recommend imposing the death penalty. In response, the state argued that joinder was proper because evidence of the rape of E.S. was admissible to help prove the identity of the person who murdered Jackson and her two children, as a similar modus operandi was used in the crimes. The trial court denied the motion, finding that joinder did not pose a "significant risk of prejudice."
*21 {¶ 46} We review a trial court's ruling on a Crim.R. 14 motion for an abuse of discretion. State v. Hand , 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 166. A defendant who appeals the denial of relief bears a heavy burden:
He must affirmatively demonstrate (1) that his rights were prejudiced, (2) that at the time of the motion to sever he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial, and (3) that given the information provided to the court, it abused its discretion in refusing to separate the charges for trial.
State v. Schaim , 65 Ohio St.3d 51, 59, 600 N.E.2d 661 (1992). "Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary, or unconscionable. Huffman v. Hair Surgeon, Inc. , 19 Ohio St.3d 83, 87, 482 N.E.2d 1248 (1985), citing *431 State v. Adams , 62 Ohio St.2d 151, 157-158, 404 N.E.2d 144 (1980). "A decision is unreasonable if there is no sound reasoning process that would support that decision." AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp. , 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).
{¶ 47} Clinton fails to show that "no sound reasoning process" could support joinder, and thus, he does not establish that the trial court abused its discretion.
{¶ 48} First, the trial court could reasonably have found that the evidence as to Clinton's rape of E.S. was simple and direct. E.S. met Clinton through a friend and was able to identify him as her assailant. She testified that he started choking her when they were alone in his apartment. He then ordered her to remove her clothes, repeatedly raped her, and then started choking her again until she lost consciousness. Nurse Dettling examined E.S. the next day and observed injuries to her neck that were consistent with her description of the attack. In addition, DNA evidence established Clinton's identity as E.S.'s assailant. See State v. Franklin , 62 Ohio St.3d 118, 122-123, 580 N.E.2d 1 (1991).
{¶ 49} Second, it was not unreasonable for the court to find that evidence of the E.S. rape would have been admissible under Evid.R. 404(B) as other-acts evidence that could prove the identity of the perpetrator of the crimes against the Jackson family. "To be admissible to prove identity through a certain modus operandi , other-acts evidence must be related to and share common features with the crime in question." State v. Lowe , 69 Ohio St.3d 527, 634 N.E.2d 616 (1994), paragraph one of the syllabus.
{¶ 50} E.S. and C.J. were raped, and all four victims were choked. See State v. Coley , 93 Ohio St.3d 253, 259-261, 754 N.E.2d 1129 (2001) ; State v. Benner , 40 Ohio St.3d 301, 306, 533 N.E.2d 701 (1988). The rapes of E.S. and the murder of the Jacksons occurred less than a week apart in Sandusky and involved an assailant driving a white Cadillac. Although the crimes differed in some respects, "[a]dmissibility is not adversely affected simply because the other [crimes] differed in some details." State v. Jamison , 49 Ohio St.3d 182, 187, 552 N.E.2d 180 (1990).
{¶ 51} Clinton argues that joinder of the rape charges in relation to E.S. with the aggravated-murder charges constituted an improper intermingling of the charges that confused the jury and was highly prejudicial during both phases of the trial.
{¶ 52} We are not persuaded by this argument. The jury is capable of segregating *22 the proof of multiple charges when, as in the present case, the evidence of each crime is uncomplicated. See Hamblin , 37 Ohio St.3d at 159, 524 N.E.2d 476. Moreover, the court, not the jury, sentenced Clinton for the convictions for raping E.S. And the trial court's sentencing instructions cautioned the jury:
*432 Some of the evidence and testimony that you considered in the trial phase of this case may not be considered in the sentencing phase.
For purposes of this proceeding, you are to consider only the evidence admitted in the trial phase that is relevant to the aggravating circumstances of which the Defendant has been found guilty and to any of the mitigating factors.
A jury is presumed to follow the instructions given to it by the trial judge. State v. Garner , 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995). Thus, we reject Clinton's claim that he was prejudiced during sentencing by evidence that the jury was instructed not to consider.
{¶ 53} Finally, Clinton argues that the joinder of charges took away his right to testify on his own behalf in the E.S. case once he decided that he did not want to testify in the Jackson case. Clinton argues that he was prejudiced because he was unable to testify that the sex with E.S. was consensual.
{¶ 54} In State v. Roberts , 62 Ohio St.2d 170, 176, 405 N.E.2d 247 (1980), we held:
To prevail upon this issue, defendant must make a convincing showing that he has important testimony to give concerning one cause, and a strong need to refrain from testifying in the other. Defendant must produce sufficient information regarding the nature of the testimony he wishes to give in the one case, and his reasons for not wishing to testify in the other, so as to satisfy the court that his claim of prejudice is genuine.
See also State v. Dean , 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 66 ("a defendant's mere desire to testify to only one count is an insufficient reason to require severance").
{¶ 55} Clinton has failed to present convincing reasons for his argument that he might have chosen to testify in one case but not in the other. Thus, he has not shown that he was prejudiced, as required by Crim.R. 14, or that he satisfies the standard laid out in Roberts .
{¶ 56} And to the extent that Clinton implies he would have argued that he did not commit rape because E.S. consented to the encounter, he would have put his intent at issue. State v. Gardner , 59 Ohio St.2d 14, 20, 391 N.E.2d 337 (1979). Under R.C. 2945.59, other acts, such as the rape of C.J., are admissible to establish intent if they " 'have such a temporal, modal and situational relationship with the acts constituting the crime charged that evidence of the other acts discloses purposeful action in the commission of the offense in question.' "
*433 Gardner at 20, 391 N.E.2d 337, quoting State v. Burson , 38 Ohio St.2d 157, 159, 311 N.E.2d 526 (1974). As explained above, the rapes share enough common features to make it reasonable to admit evidence related to the rape of C.J. to show that Clinton intended to rape E.S.
{¶ 57} Based on the foregoing, we reject proposition of law No. IV.
*23 2. Venue
{¶ 58} In proposition of law No. VI, Clinton argues that the trial court violated his rights to due process and a fair trial by denying his motion for a change of venue.
{¶ 59} Trial courts have a "duty to protect" criminal defendants from "inherently prejudicial publicity" that renders a jury's deliberations unfair. Sheppard v. Maxwell , 384 U.S. 333, 363, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Even so, "pretrial publicity-even pervasive, adverse publicity-does not inevitably lead to an unfair trial." Nebraska Press Assn. v. Stuart , 427 U.S. 539, 554, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). "[T]he best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality" is "a careful and searching voir dire." State v. Bayless , 48 Ohio St.2d 73, 98, 357 N.E.2d 1035 (1976).
{¶ 60} Decisions about whether to order a change of venue rest " 'largely in the discretion of the trial court.' " State v. Thompson , 141 Ohio St.3d 254, 23 N.E.3d 1096, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 91, quoting State v. Fairbanks , 32 Ohio St.2d 34, 37, 289 N.E.2d 352 (1972). We will not reverse a trial court's venue ruling "unless it is clearly shown that the trial court has abused its discretion." Fairbanks at 37, 289 N.E.2d 352. An abuse of discretion is more than a mere error of law or judgment; instead, it implies that a trial court's decision was unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore , 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).
a. Motion for change of venue
{¶ 61} Clinton moved for a change of venue, arguing that extensive media coverage had saturated the county at the time of the offenses and was likely to resume once the trial started.
{¶ 62} Before voir dire began, the prospective jurors completed a 14-page jury questionnaire. Both the trial court and counsel individually questioned each prospective juror about their exposure to pretrial publicity and their attitudes about the death penalty. Individual voir dire lasted for seven days and resulted in over 2,000 pages of transcript.
{¶ 63} The trial court denied the motion for a change of venue. The court rejected claims of presumed prejudice, stating, "While in the present case the *434 pretrial publicity is extensive and adverse to the defendant, the publicity is not sufficiently prejudicial that readers and viewers could not realistically shut it from sight." The court also rejected claims of actual prejudice stating, "The Court has qualified 72 prospective jurors on the issue of pretrial publicity and capital punishment. Thus, at this time the Defendant cannot demonstrate actual prejudice."
b. No presumed bias
{¶ 64} Clinton urges this court to presume prejudice because of the extent of the publicity. The United States Supreme Court has held that in certain rare cases, pretrial publicity is so damaging that courts must presume prejudice even without a showing of actual bias. See, e.g., Sheppard , 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600. But this presumption "attends only the extreme case." Skilling v. United States , 561 U.S. 358, 381, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010) ; see also State v. Treesh, 90 Ohio St.3d 460, 464, 739 N.E.2d 749 (2001).
{¶ 65} To prevail on a claim of presumed prejudice, a defendant must make " 'a clear and manifest showing * * * that pretrial publicity was so pervasive and prejudicial that an attempt to seat a jury would be a vain act.' "
*24 State v. Warner , 55 Ohio St.3d 31, 46, 564 N.E.2d 18 (1990), quoting State v. Herring , 21 Ohio App.3d 18, 486 N.E.2d 119 (9th Dist.1984), syllabus.
{¶ 66} Clinton argues that the extensive pretrial publicity surrounding the murders of Jackson and her children made it impossible for him to obtain a fair trial in Erie County. But the trial court was very conscious of pretrial publicity in Clinton's case. Each potential juror completed an extensive publicity questionnaire, and the court permitted thorough questioning about pretrial publicity during individual voir dire. Although most prospective jurors had heard or read something about the facts of the case, knowing something about media accounts of the crimes is not dispositive. See Thompson , 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, at ¶ 102.
{¶ 67} Jurors need not be totally ignorant about the facts of a case. See Irvin v. Dowd , 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The trial court excused 24 prospective jurors because they knew too much about the murders or believed that Clinton was guilty. These excusals support the conclusion that the court ensured that Clinton's jury would not be unfair or biased. See Thompson at ¶ 102.
{¶ 68} Clinton also argues that the emergence of social media has made pretrial publicity far more pervasive and prejudicial. But the trial court rejected claims that Clinton was prejudiced by online news reports, noting, "[R]esidents from all counties in Ohio may access these sources and post comments. Thus, this court is unable to determine how many residents from only Erie County have *435 accessed these online sources and posted comments." Moreover, nothing in the record supports Clinton's claim that pervasive pretrial publicity from online sources and social media prejudiced him.
{¶ 69} Finally, Clinton analogizes the facts of his case to those in other cases in which the United States Supreme Court has presumed prejudice. See Sheppard, 384 U.S. at 358, 86 S.Ct. 1507, 16 L.Ed.2d 600 (murder conviction overturned because a "carnival atmosphere" pervaded the trial); Rideau v. Louisiana , 373 U.S. 723, 724, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (defendant's confession was viewed on television by audiences of 20,000 to 53,000 people in a total population of 150,000 three times within weeks of his arraignment); Irvin , 366 U.S at 727, 81 S.Ct. 1639, 6 L.Ed.2d 751 (90 percent of prospective jurors "entertained some opinion as to guilt," and "[8] out of the 12 [jurors] thought [Irvin] was guilty"). But the publicity in this case did not begin to approach the level of pervasive influence present in those extraordinary cases. See also Mammone , 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, at ¶ 60-68. Thus, Clinton fails to demonstrate that this is the rare case in which we must presume prejudice.
3. Other Juror-Bias Claims
{¶ 70} In proposition of law No. VIII, Clinton argues that the trial court erred in overruling a timely challenge against prospective juror No. 363 after that prospective juror stated in the presence of other prospective jurors that he had heard that the defendant had admitted his guilt. He also argues that the trial court erred in overruling a challenge for bias against prospective jurors Nos. 73 and 22, causing defense counsel to use peremptory challenges to remove them.
a. Prospective juror No. 363
{¶ 71} During individual voir dire, prospective juror No. 363 stated that he had "heard from other people" that the defendant had admitted committing the offenses. He added, "If he admitted to doing so, then I believe he would be telling the truth, so I would think he would be guilty." He also stated, "Just last night. I actually *25 read a petition from the family and * * * some brief things." During defense questioning, prospective juror No. 363 said that he had talked about the case with another prospective juror. When asked what had been discussed, he said, "Just what we were doing here, and [what] I read in the paper about the petition." He said their discussion had turned away from what had happened and more toward how long the trial was going to take.
{¶ 72} At the conclusion of the individual voir dire of prospective juror No. 363, defense counsel challenged this prospective juror for cause based on his inability to apply the presumption of innocence and fairly consider the mitigating factors. The trial court denied this challenge, stating:
*436 I think this juror was a great juror for both sides. He was very honest. He said he could follow the instructions of law. He said he could formulate his opinion based on his own beliefs. He said he could apply the instructions of law to the facts of this case.
{¶ 73} Later, during general voir dire, defense counsel pressed prospective juror No. 363 about his ability to be a fair and impartial juror. Prospective juror No. 363 stated that he had worked with Jackson five or six years prior to the trial but that nothing about their acquaintance would affect his ability to be fair and impartial. During further questioning, prospective juror No. 363 admitted that he would have a difficult time being open-minded because he had "heard * * * people say" that Clinton had admitted his guilt. Thereafter, Clinton's trial counsel renewed his challenge for cause against prospective juror No. 363. The trial court granted the challenge and excused him.
{¶ 74} Clinton argues that the trial court erred by not granting his initial challenge for cause against prospective juror No. 363. A trial court has broad discretion in determining a juror's ability to be impartial. State v. White , 82 Ohio St.3d 16, 20, 693 N.E.2d 772 (1998). "Thus, where a prospective juror is being challenged for bias, 'deference must be paid to the trial judge who sees and hears the juror.' " Id. , quoting Wainwright v. Witt , 469 U.S. 412, 426, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).
{¶ 75} But Clinton has failed to demonstrate that the trial court abused its discretion in denying the initial challenge for cause against prospective juror No. 363. This prospective juror stated that he could decide the case based on the evidence presented in court and follow the court's instructions. He also said that he could consider any mitigating evidence before rendering a sentence. The trial court had the benefit of observing prospective juror No. 363's demeanor and body language in listening to his answers. The trial court fairly determined, "I thought he was very, very honest, and said, 'Yeah, I really don't want to do this, but I'll do it if I have to.' "
{¶ 76} Even though prospective juror No. 363 was later excused, Clinton argues that he tainted the jury pool during general voir dire by stating that he had heard that the defendant had admitted his guilt. But Clinton cites nothing in the record to demonstrate that these remarks biased or prejudiced the empaneled jurors. Generally, prejudicial effect is not presumed, but must be affirmatively shown on the record. See Treesh , 90 Ohio St.3d at 464, 739 N.E.2d 749 ; State v. Hairston , 4th Dist. Scioto, No. 06CA3087, 2007-Ohio-4159, 2007 WL 2318692, ¶ 14.
{¶ 77} In addition, the jurors were instructed that they were to consider only the evidence presented at trial. Specifically, *26 the trial court instructed the jurors: *437 "You must consider and decide this case only upon the evidence, again, that you receive in this courtroom. If you acquire any information from an outside source, you must not-you must not report it to other jurors and you must disregard it in your deliberations." Under these circumstances, no error occurred. See State v. Feagin , 5th Dist. Richland No. 05 CA 1, 2006-Ohio-676, 2006 WL 337382, ¶ 26.
b. Prospective juror No. 73
{¶ 78} Clinton argues that the trial court erred in denying a challenge for cause against prospective juror No. 73, forcing defense counsel to use a peremptory challenge to excuse her.
{¶ 79} During individual voir dire, prospective juror No. 73 stated that she knew some of the victims' family members and one of Jackson's best friends. But she stated, "It's not a close relationship." She was also familiar with Clinton, who had worked at the same delicatessen as her friend. Prospective juror No. 73 said she had never spoken to Clinton but that her friend had reported to her that Clinton had attempted to "hit on" her. The friend had described Clinton as "weird" and a "creepy guy."
{¶ 80} During further questioning, prospective juror No. 73 stated that she would be able to follow the court's instructions and base her decisions only on what she heard in court. When asked whether she would rely more on what she heard in court or what she had heard outside of court, prospective juror No. 73 said, "Probably what I heard in the court." But she immediately clarified that she would follow the court's instructions.
{¶ 81} Defense counsel challenged prospective juror No. 73 for cause because she knew one of Jackson's friends and some of her family members and she thought Clinton was "creepy." The trial court overruled the challenge, stating:
The "creepy word"-I have a daughter that's in her almost mid 20s. That's a word that girls use when-it's no offense, I don't think, to Mr. Clinton as a man. I mean * * * it's just maybe they don't like the guy and they go, "Oh, he's creepy. I don't want anything to do with that guy."
So I don't know that that's a basis for a challenge for cause.
{¶ 82} Later, during general voir dire, both parties again questioned prospective juror No. 73 about her relationship with the victims' family. Prospective juror No. 73 stated that she had known Jackson's brother when she was ten years old. She also knew three potential witnesses: Jeremy Griggs (they went to school together), Josh Case (she knew him but had not seen him in years), and Detective Nixon (he is acquainted with her son's grandfather).
*438 {¶ 83} At sidebar, defense counsel stated that prospective juror No. 73 was "Facebook friends" with Jackson's brother. He added, "I want to go and ask her particularly about that, because it's Heather's brother."
{¶ 84} Prospective juror No. 73 was questioned in chambers about her relationship with Jackson's brother. She said, "We never said anything to each other. Never wrote on each other's page. Never sent each other a special message." Yet she acknowledged having read Jackson's brother's comments about the case on Facebook and stated, "The only thing * * * I seen a couple times where they had posted like support for the family and stuff like that." She added that Jackson's brother's postings would not affect her view of the *27 evidence. She said her views about Jackson's brother were neutral. Defense counsel did not challenge prospective juror No. 73 following this questioning.
{¶ 85} Upon returning to the courtroom, defense counsel asked prospective juror No. 73 two questions about DNA evidence. Defense counsel then stated, "All right. I have no further questions. Pass for cause." Defense counsel later peremptorily challenged this prospective juror.
{¶ 86} Clinton argues that the trial court erred in denying a defense challenge for cause against prospective juror No. 73, because this juror knew Clinton well enough to form an opinion that he was "creepy." But the prospective juror's use of the word "creepy" was framed by defense counsel's questions. He presented two options to prospective juror No. 73 in asking whether her friend thought that Clinton was a "cute guy" or a "creepy guy." Her response does not establish that she had a preconceived opinion about Clinton's guilt. And it does not establish that the trial court erred by overruling a defense challenge for cause on this ground.
{¶ 87} Clinton also argues that the trial court erred in denying the challenge for cause, because prospective juror No. 73 knew Clinton and had personal connections with Jackson's family and best friend. But in describing her connections, prospective juror No. 73 stated, "It's not a close relationship. * * * I just know them through-kind of like when I see them, I say 'Hi.' So it's not a very, very close one." Prospective juror No. 73 later added that she had not talked to Jackson's brother in years and assured the court that her Facebook relationship with him would not influence her decision in the case. See McGaha v. Commonwealth , 414 S.W.3d 1, 6 (Ky.2013) ("merely being friends on Facebook does not, per se , establish a close relationship from which bias or partiality on the part of a juror may reasonably be presumed").
{¶ 88} Fairness requires impartial jurors. "Whether a prospective juror knew the victim of an offense or had previously seen the accused is not, per se , a basis for dismissal for cause." State v. Sheppard , 84 Ohio St.3d 230, 235, 703 N.E.2d 286 (1998). The trial court's failure to excuse prospective juror No. 73 was not an *439 abuse of discretion. Prospective juror No. 73 stated that she would be able to decide this case based solely on the evidence presented in court.
{¶ 89} Nevertheless, Clinton argues that the only guarantee that prospective juror No. 73 provided was that she would "probably" follow what she heard in court versus what she had heard elsewhere through her connections to the victims. But prospective juror No. 73 clarified that she would be able to follow the court's instructions "with respect to that." "The fact that the defense counsel was able to elicit somewhat contradictory viewpoints from [this prospective juror] during his examination does not, in and of itself, render the court's judgment erroneous." State v. Scott , 26 Ohio St.3d 92, 98, 497 N.E.2d 55 (1986). "[D]eference must be paid to the trial judge who sees and hears the juror." Wainwright , 469 U.S. at 426, 105 S.Ct. 844, 83 L.Ed.2d 841.
{¶ 90} Clinton invokes White v. Mitchell , 431 F.3d 517 (6th Cir.2005), in arguing that prospective juror No. 73's contradictory statements show that she should have been excused for cause. Yet White is readily distinguishable. Despite cursory statements that she could follow the law, the juror in White repeatedly expressed doubt as to whether she could follow the law and stated that "she did not think it would be fair to the defendant for her to sit on the jury." Id. at 541. White presented a "particularly *28 egregious situation in which an individual desired to participate on a jury because she wanted to provide one of the twelve votes for death against a particular defendant." Trimble v. Bobby , 804 F.3d 767, 779 (6th Cir.2015). The voir dire of prospective juror No. 73 in this case contains nothing comparable.
{¶ 91} Finally, Clinton argues that he was forced to expend a peremptory challenge to remove prospective juror No. 73 after the trial court failed to remove her for cause. He argues that this resulted in prejudicial error because he exhausted all his peremptory challenges before the full jury was seated.
{¶ 92} As a matter of state law, this court has recognized that when the defense exhausts its peremptory challenges before the full jury is seated, the erroneous denial of a challenge for cause may be prejudicial. State v. Hale , 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 87. However, as discussed above, the trial court did not err, but properly overruled the defense challenge for cause against prospective juror No. 73. Thus, counsel were not forced to use a peremptory challenge on a juror who should have been excused for cause. Accordingly, we reject this claim.
c. Prospective juror No. 22
{¶ 93} Clinton argues that the trial court erred in denying a challenge for cause against prospective juror No. 22, because of his inability to hold the prosecution to its burden of proof. Clinton claims that he was forced to use a peremptory *440 challenge to excuse this prospective juror. However, Clinton has waived this bias claim, because defense counsel did not challenge this prospective juror for cause. See State v. Yarbrough , 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 102. Thus, no error, plain or otherwise, was committed in excusing this prospective juror.
{¶ 94} Based on the foregoing, proposition of law No. VIII is rejected.
4. Other-Acts Evidence
{¶ 95} In proposition of law No. III, Clinton argues that the trial court erred by allowing the state to present "other acts" evidence related to his 1999 conviction for the involuntary manslaughter of 18-year-old Misty Keckler, who died by strangulation.
a. Evid.R. 404(B)
{¶ 96} "Evidence of other crimes, wrongs, or acts is not admissible to prove" a defendant's character as to criminal propensity. Evid.R. 404(B). "It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Id. "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." State v. Sage , 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus.
{¶ 97} This court has set forth the following three-step analysis that should be used by trial courts when considering other-acts evidence: (1) Is the evidence relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence? (2) Is the evidence of the other crimes, wrongs, or acts presented to prove the character of the accused in order to show activity in conformity therewith, or is it presented for a legitimate purpose, such as those stated in Evid.R. 404(B) ? (3) Is the probative value of the other-acts evidence substantially outweighed by the danger of unfair prejudice? State v. Williams , 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20.
*29 b. Evidence related to Keckler's homicide
{¶ 98} Prior to trial, the state gave notice that it intended to present evidence relating to Clinton's involuntary-manslaughter conviction for the death of Keckler. This evidence was introduced to prove Clinton's identity as the killer of the Jackson family based on the similar modus operandi and to prove his modus operandi in committing the rape of E.S. Over defense objection, the trial court admitted this evidence under Evid.R. 404(B).
{¶ 99} The trial court applied the three-step analysis in admitting the Keckler evidence under Evid.R. 404(B). First, the court found that the evidence was *441 relevant ( Evid.R. 401 ), stating that the modus operandi of the Keckler homicide "is so strikingly similar" to the Jackson murders and the rape of E.S. that the Keckler evidence was relevant despite the 13 years separating Keckler's homicide from the crimes charged in the indictment.
{¶ 100} Second, the court determined that the Keckler evidence was presented for a legitimate purpose under Evid.R. 404(B) : "to prove the identity of the killer of the three victims [and] to prove the identity and modus operandi of Defendant when committing a sexual assault on victim E.S." Finally, the court determined that the probative value of the Keckler evidence was not substantially outweighed by the danger of unfair prejudice. Evid.R. 403.
{¶ 101} During the state's case-in-chief, Michael Clark, a retired police detective who investigated Keckler's homicide, testified that her body was discovered in a house trailer in Fostoria before 7:00 a.m. on April 3, 1997. Her nude body was face down in the bathtub. She had ligature marks on her neck and her hands were bound behind her back and her ankles were bound together. According to Clark, it was clear from the lack of bruising that the perpetrator had bound her hands and ankles after she died.
{¶ 102} Clark had interviewed Clinton in relation to that crime, and Clinton admitted to having had sexual contact with Keckler. Clark testified that Clinton had pled guilty to involuntary manslaughter for the Keckler homicide.
{¶ 103} Following Clark's testimony, defense counsel moved for a mistrial, arguing that none of his testimony was admissible under Evid.R. 404(B). This motion was denied.
{¶ 104} During closing arguments of the guilt phase of the trial, the prosecutor explained that the only purpose for the Keckler evidence was to meet the state's "burden of proof to try to determine the identity of the killer of Heather Jackson and her children ." (Emphasis added.) The prosecutor argued that the evidence showed a modus operandi and showed that Clinton had a sexual motivation for the crimes, one of the charged specifications. He characterized the two crimes as "strikingly similar," emphasizing the following similarities: the victims were both "young, blonde, pretty girls," murdered in their own residences; they were strangled from behind with a ligature in the early morning; their bodies were both found naked, lying prone; both cases involved sexual contact; and the perpetrator had attempted to degrade the evidence in both cases (wedging Jackson between a mattress and box spring and submerging Keckler in a tub of hot water).
{¶ 105} The trial court provided limiting instructions on the consideration of the Keckler evidence, stating: "[Y]ou may not consider it to prove the character of the Defendant in order to show that he acted in conformity or in accordance with that character." Instead, the jury could consider *30 it "only for the purpose of *442 deciding whether it proves, A, the Defendant's motive, opportunity or intent or purpose, preparation or plan to commit the offense charged in this trial or, B, the identity of the person who committed the offense in this trial." Further, the jury was told, "That evidence cannot be considered for any other purpose."
c. Analysis
{¶ 106} In Lowe , 69 Ohio St.3d at 531, 634 N.E.2d 616, this court described the parameters of admitting other-acts evidence to show modus operandi. Evidence of a modus operandi is admissible "because it provides a behavioral fingerprint which, when compared to the behavioral fingerprints associated with the crime in question, can be used to identify the defendant as the perpetrator." Id. Other-acts evidence is admissible to prove identity through a certain modus operandi only if it is "related to and share[s] common features with the crime in question." Id.
{¶ 107} Clinton argues that the evidence of Keckler's homicide does not show modus operandi, because her strangulation was not distinctive enough to identify him as the perpetrator of the Jackson murders or the E.S. rape.
(1) Adult victims
{¶ 108} Several common features link Jackson's murder and E.S.'s rape with Keckler's homicide. All three victims were young Caucasian women who were raped by and/or engaged in sexual contact with Clinton before they were strangled. Each attack occurred during the late evening or early morning hours. The nude bodies of Jackson and Keckler were both found lying face down. And although E.S. survived her attack, she had been forced to remove her clothing.
{¶ 109} Certainly, there were differences between the Keckler homicide and the two charged offenses, but "[a]dmissibility is not adversely affected simply because the other [crimes] differed in some details. * * * The weight to be given to this evidence is for the jury to determine," Jamison , 49 Ohio St.3d at 187, 552 N.E.2d 180 ; accord State v. Craig , 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 44.
{¶ 110} Other Ohio cases have reached a similar result. See State v. Ross , 2014-Ohio-2867, 15 N.E.3d 1213, ¶ 59-62 (9th Dist.) (evidence that two women who were intoxicated sustained severe blows to the face, remained partially clothed while being sexually assaulted, and lost consciousness due to some form of strangulation similar enough to establish identity by modus operandi); State v. Hood , 8th Dist. Cuyahoga No. 75210, 1999 WL 1204862, *7 (Dec. 16, 1999) (method of squeezing the neck of two different women similar enough to be admissible to establish identity by modus operandi). Thus, evidence of Keckler's homicide was admissible to show a modus operandi identifying Clinton as committing Jackson's murder and E.S.'s rape.
*443 {¶ 111} Nevertheless, Clinton argues that Clark's testimony was sketchy and failed to establish that Keckler had been strangled. But Clark testified that Keckler's body was found with ligature marks on her neck. The state also introduced photographs taken of her body at the scene that showed ligature marks and bruising resulting from strangulation.
{¶ 112} Moreover, the trial court had earlier determined that the state provided "substantial proof of the strangulation by ligature" when it ruled that the evidence of Keckler's homicide was admissible. See Jamison , 49 Ohio St.3d at 183, 552 N.E.2d 180 ("To be admissible, these other acts must tend to show by substantial proof 'identity' or other enumerated purposes *31 under Evid.R. 404(B)"). As a result, the prosecutor may have determined that it was unnecessary to introduce further details about Keckler's death at trial, a decision that also minimized the danger of unfair prejudice. See State v. Hirsch , 129 Ohio App.3d 294, 308, 717 N.E.2d 789 (1st Dist.1998).
{¶ 113} Finally, Clinton argues that the trial court erred in admitting Clark's testimony, because the state relied on DNA evidence to establish his identity. However, during opening statements, defense counsel put identity at issue, telling the jury, "The issue will be, who did it, because that's the case."
(2) Child victims
{¶ 114} Clinton also argues that the trial court erred in admitting evidence about Keckler's homicide for purposes of identifying the killer of three-year-old C.J. and one-year-old W.J.
{¶ 115} The trial court's instructions made no distinction between the adult victims and the child victims and the jury's consideration of the Keckler evidence. The prosecutor also argued that the sole purpose of the Keckler evidence was to determine the identity and motivation of the killer of "Heather Jackson and her children."
{¶ 116} There are fewer similarities between the Keckler homicide and the murders of the two children. Thus, Clark's testimony had little tendency to show a common scheme, plan, or intent because Keckler was an adult and C.J. and W.J. were small children.
{¶ 117} We hold that evidence of the Keckler homicide was inadmissible under Evid.R. 404(B) for the purpose of identifying the children's killer, and the trial court should have instructed the jurors that they could not consider the evidence for that purpose. But such error was harmless beyond a reasonable doubt, considering the DNA evidence and other testimony establishing Clinton's guilt in murdering C.J. and W.J. See *444 Chapman v. California, 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ; State v. Morris , 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 33.
{¶ 118} Based on the foregoing, we reject proposition of law No. III.
5. Inflammatory Photographs
{¶ 119} In proposition of law No. IX, Clinton argues that the trial court erred by admitting inflammatory crime-scene and autopsy photographs during both phases of the trial. As previously discussed, trial counsel failed to object to this evidence during the guilt phase of the trial and no plain error was committed in admitting these exhibits.
{¶ 120} Clinton also argues that the trial court erred in admitting two autopsy photographs during the penalty phase of the trial. State's exhibit 135 is a photo of W.J.'s body. State's exhibit 152 is a photograph of the lower half of C.J.'s body and shows her rolled-up underwear. Both photographs were relevant as to the R.C. 2929.04(A)(9) (murder of a child under 13) aggravating circumstances. The photograph of C.J. was also relevant to the R.C. 2929.04(A)(7) (aggravated murder during rape) aggravating circumstance. No error occurred in admitting these photographs, since the probative value of each photograph outweighed any prejudice. See State v. DePew , 38 Ohio St.3d 275, 282-283, 528 N.E.2d 542 (1988).
6. Rulings on Evidentiary Matters and Motions
{¶ 121} In proposition of law No. XV, Clinton argues that the trial court permitted improper testimony, made several erroneous *32 evidentiary rulings, and erred in overruling defense motions and objections.
a. Voir dire, victim-impact testimony , and evidentiary matters
(1) Voir dire questioning
{¶ 122} Clinton objects to the prosecutor's generalized questions during general voir dire about a rape victim's behavior. The prosecutor, over defense counsel's objection, asked, "And is it fair to say that maybe in that experience that-that victims can do all kinds of things after the incident as far as reporting or not reporting?"
{¶ 123} Trial judges have discretion over voir dire and are not required to exclude all possibly controversial topics. State v. Wilson , 74 Ohio St.3d 381, 387, 659 N.E.2d 292 (1996). In view of the E.S. rape charges, it was reasonable for the prosecutor to inquire about the prospective jurors' experience with victims of sexual assault in determining their ability to fairly consider issues that would arise at trial. See State v. Collymore , 8th Dist. Cuyahoga No. 81594, 2003-Ohio-3328, 2003 WL 21469121, ¶ 65. The trial court did not abuse its discretion by allowing such limited questioning.
*445 (2) Hanson's repetition of what he told the police
{¶ 124} Clinton argues that Thomas Hanson's testimony repeating what he told police concerning his discovery of the victims' bodies was improper victim-impact testimony and hearsay.
{¶ 125} During direct examination, Hanson testified that he had told Detective Wichman, " 'Dude, if I knew what happened, I would tell you.' * * * You know, what happened to Heather, that's-for them little kids, you know, for somebody to do that." Defense counsel's objection to these comments was sustained; hence, there was no error. See Hale , 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, at ¶ 162. In response to additional questioning about what he had told the police, Hanson testified that he had said, " 'I mean, that's, you know, some sick individual that would-.' " An objection on the grounds of hearsay and improper victim-impact testimony was overruled.
{¶ 126} Victim-impact evidence that relates only "to the personal characteristics of the victim and the emotional impact of the crimes on the victim's family," Payne v. Tennessee , 501 U.S. 808, 817, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), is generally inadmissible at the trial phase, but such evidence can be admissible if it also "relat[es] to the facts attendant to the offense," State v. Fautenberry , 72 Ohio St.3d 435, 435, 650 N.E.2d 878 (1995). Hanson's characterization of the murderer as "some sick individual" was not admissible victim-impact evidence.
{¶ 127} Hanson's repetition in court of what he had said to police is hearsay. Evid.R. 801(C). And contrary to the state's claims, it was not admissible as a prior consistent statement. The statement was not "offered to rebut an express or implied charge against [the declarant] of recent fabrication or improper influence or motive." Evid.R. 801(D)(1)(b). Similarly, Hanson's statement was not admissible as a prior consistent statement simply because Wichman had been pressing him on what had happened. See State v. Fears , 86 Ohio St.3d 329, 339, 715 N.E.2d 136 (1999).
{¶ 128} The state also argued at trial that Hanson's statement was admissible because he was subject to cross-examination. But such statements are hearsay notwithstanding the availability of the declarant to be cross-examined.
{¶ 129} Thus, Hanson's hearsay statement was improper. Nevertheless, its *33 admission was harmless beyond a reasonable doubt in view of other evidence establishing Clinton's guilt. See Morris , 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, at ¶ 33.
(3) Hanson's testimony about regaining his composure
{¶ 130} During cross-examination, Hanson was questioned about the delay in calling the police following the discovery of Jackson's body. On redirect, the *446 prosecutor asked, "How long did it take you to regain your composure?" Hanson replied, "I don't even know if I still have. I mean, I fall asleep at night and I see that stuff." An objection was overruled.
{¶ 131} Clinton asserts that Hanson's answer constituted inadmissible victim-impact testimony and hearsay. Neither objection applies. Hanson's comment about his emotional state after finding Jackson's body was not hearsay and was relevant in explaining his reasons for the delay in calling the police. Moreover, this was not inadmissible victim-impact testimony. See Fautenberry , 72 Ohio St.3d at 440, 650 N.E.2d 878.
(4) Wichman's characterization of Clinton's interview
{¶ 132} Clinton argues that Wichman's discussion about his interview was improper victim-impact evidence. Over defense counsel's objection, Wichman said, "It was an extremely difficult interview. Probably the worst interview I ever did, situation-wise."
{¶ 133} Wichman's difficulty in conducting the interview was not a material issue. Moreover, the state fails to provide any plausible reason why such testimony might have been relevant. See 2 Giannelli, Evidence, Section 801.10, at 140 (3d Ed.2010); United States v. Lamberty , 778 F.2d 59, 61 (1st Cir.1985). But any error in admitting this testimony was harmless in light of the evidence of Clinton's guilt. And Wichman's characterizations of Clinton's interview do not qualify as victim-impact evidence. See Payne , 501 U.S. at 817, 111 S.Ct. 2597, 115 L.Ed.2d 720. This claim is also rejected.
(5) E.S.'s testimony about counseling
{¶ 134} Clinton argues that the trial court erred in permitting E.S. to testify, over defense objection, that she received counseling after the rape. Even if such testimony was of questionable relevance, E.S.'s testimony was brief and "not overly emotional or directed to the penalty to be imposed," Lang , 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, at ¶ 237. Such error was not prejudicial.
(6) Nixon's testimony identifying Clinton as the suspect in the rape of E.S.
{¶ 135} Clinton argues that the trial court erred in allowing Detective Nixon to identify him as the suspect in the rape of E.S. Nixon testified that he talked to E.S. following her rape allegations. The prosecutor then asked, "And based on the interview with [E.S] and your conversations with her, did you have in mind a suspect?" Nixon said, "Yes," and, after an objection was overruled, Nixon identified Clinton as that suspect.
{¶ 136} A law-enforcement officer may testify about a declarant's out-of-court statement for the nonhearsay purpose of explaining the next investigative step.
*447 State v. Thomas , 61 Ohio St.2d 223, 232, 400 N.E.2d 401 (1980). But such testimony is not permitted if the statement in question "connect[s] the accused with the crime charged." State v. Ricks , 136 Ohio St.3d 356, 2013-Ohio-3712, 995 N.E.2d 1181, ¶ 27.
{¶ 137} Here, Nixon's testimony regarding E.S.'s statements connected Clinton to her rape and thus constituted inadmissible *34 hearsay. Nixon could have explained how he pursued his investigation without linking Clinton to the rape. See Id. at ¶ 51 (French, J., concurring in judgment only) ("It is usually possible to explain the course of an investigation without relating historical aspects of the case, and in most cases, testimony that the officer acted 'upon information received,' or words to that effect, will suffice"), citing 2 McCormick, Evidence , Section 249, at 193-195 (7th Ed.2013).
{¶ 138} Nevertheless, the admission of this evidence was harmless beyond a reasonable doubt. See State v. McKelton , 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 190 (evidence violated Ricks , but error was harmless beyond a reasonable doubt). Viewed alongside other evidence, including DNA linking Clinton to the E.S. rape, there is no reasonable possibility that Nixon's improper testimony contributed to his convictions.
(7) Nurse Dettling's testimony
{¶ 139} Clinton argues that Dettling, a nurse trained in examining sexual-assault victims, improperly testified as to what E.S. told her about the rape. Dettling conducted a sexual-assault examination of E.S. Defense counsel sought to limit Dettling's testimony by objecting to E.S.'s statements that were unrelated to her need for medical diagnosis and treatment. In overruling the objection, the trial court stated, "[T]he medical is important. The Court will allow that."
{¶ 140} Dettling testified that E.S. had reported being raped and choked, and then Dettling briefly described what E.S. said had happened. Dettling said she had examined E.S., photographed her injuries, and completed a sexual-assault kit. During cross-examination, defense counsel questioned the accuracy of Dettling's report and tried to show that E.S. had failed to disclose that she had been drinking prior to the alleged rape.
{¶ 141} On redirect examination, over defense counsel's objection, the prosecutor had Dettling read the full narrative statement E.S. gave about Clinton's raping her. The narrative included events involving Clinton, E.S., and Mercedes Charlton that occurred before and after the rape, and E.S.'s description of Clinton's choking and raping her. The narrative concluded: "Patient states, 'I don't want to press charges and I don't want my mom to know everything because I didn't tell all the truth at Bellevue in front of her.' "
*448 {¶ 142} Statements may be admitted at trial as an exception to the hearsay rule pursuant to Evid.R. 803(4) if they were made for the purposes of medical diagnosis and treatment. See State v. Stahl , 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834.
{¶ 143} Clinton does not explain which segments of E.S.'s narrative statement he believes were improperly admitted. Nevertheless, information E.S. provided about "the identity of the perpetrator, the age of the perpetrator, the type of abuse alleged, and the time frame of the abuse" were all for medical diagnosis. State v. Arnold , 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, ¶ 32. Other information in the narrative (i.e., Charlton's presence before the rape and E.S.'s concern about her mother) may have been improperly admitted, because the primary purpose of such information was investigative. Id. at ¶ 44.
{¶ 144} Even assuming that Dettling's testimony was improper, any such error was harmless beyond a reasonable doubt, considering other overwhelming evidence establishing Clinton's guilt. See Morris , 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, at ¶ 23.
*35 (8) Evidence related to Keckler's homicide
{¶ 145} Clinton argues that the trial court erred in admitting other-acts testimony about Keckler's homicide, Clark's improper opinion testimony about her injuries and death, and photographs of her body. We have addressed these issues earlier in discussing proposition of law Nos. III and XI.
b. Videotape of Clinton's police interview
{¶ 146} Clinton argues that the trial court erred by admitting the videotape of his police interview, because it was accompanied by inaccurate captions.
{¶ 147} Clinton's videotaped interview was augmented with captions indicating what was being said. The prosecutor informed the court, "We did this with this certified transcript * * *. * * * [T]hey took the transcripts and applied it to the tape." Defense counsel objected, citing "inaccuracies with the timing, [and] inaccuracies with the words [that do not] match up with the transcripts." Counsel stated that a "major discrepancy" between the transcript and the videotape included the use of " 'was' versus 'was not.' " But defense counsel did not pinpoint the location of that alleged discrepancy on the videotape.
{¶ 148} At the defense's request, before the videotape was played, the trial court instructed the jury, "[C]onsider whether the videotape is a true record of what transpired at the time that it was taken. If you find that it is, you will then determine what weight, if any, the videotape should receive in light of all of the *449 evidence." The trial court also told the jury, "Please rely on what you hear over what you read."
{¶ 149} "Where there are no 'material differences' between a tape admitted into evidence and a transcript given to the jury as a listening aid, there is no prejudicial error." State v. Waddy , 63 Ohio St.3d 424, 445, 588 N.E.2d 819 (1992). Clinton claims that there are "substantive inaccuracies" in the captions, but he fails to identify those inaccuracies. This claim lacks merit.
{¶ 150} He also argues that the quick-moving text on the videotape made it difficult for the jury to pay attention to the audio. But nothing in the record suggests that this was the case. Moreover, the trial court instructed the jurors to rely on what they heard over what they read. Jurors are presumed to follow a court's instructions in this regard. See State v. Jones , 4th Dist. Highland No. 04CA9, 2005-Ohio-768, 2005 WL 433433, ¶ 31. This claim is rejected.
c. Defense motions
(1) Pretrial and trial motions that were denied
{¶ 151} Clinton asserts that the trial court erred in denying various pretrial and trial motions. He sets forth a list of objectionable rulings, but provides no explanation of how they were erroneous. Nothing shows that these rulings were improper. Moreover, most of these rulings involve settled principles of law and/or issues addressed in other propositions of law. Thus, these claims are rejected.
(2) Daubert motion
{¶ 152} Clinton complains that the trial court erred in denying his motion challenging the reliability of the method used in testing the evidence for DNA. That motion relied on Daubert v. Merrell Dow Pharmaceuticals, Inc. , 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). "[U]nder [ Fed.R.Evid. 702 ] the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Id. at 589, 113 S.Ct. 2786. See *36 Terry v. Caputo , 115 Ohio St.3d 351, 2007-Ohio-5023, 875 N.E.2d 72, ¶ 24-26 (Ohio judges applying Evid.R. 702 exercise same gatekeeping function).
{¶ 153} The trial court held a Daubert hearing at which Garofalo, the forensic scientist who conducted the DNA testing, provided a detailed explanation of the procedures and tests used to develop the DNA profiles in this case. Following her testimony, the trial court held that the DNA evidence was "admissible and complies with the factors set forth in Daubert ."
{¶ 154} Clinton does not explain how the trial court erred in determining that the DNA evidence was admissible. Rather, he complains that the trial court denied his Daubert motion "without fully understanding the meaning of the motion in the first place." But we find otherwise. The trial court held a hearing *450 and heard detailed testimony from the forensic scientist who conducted the DNA testing in this case. And the trial court's written order holding that the evidence was admissible under Daubert demonstrated that it was well versed in this area of law.
{¶ 155} Finally, the determination whether expert testimony is admissible is within the trial court's discretion. Evid.R. 104(A) ; Miller v. Bike Athletic Co. , 80 Ohio St.3d 607, 616, 687 N.E.2d 735 (1998) (lead opinion). Clinton presents nothing to indicate that the trial court abused its discretion in admitting the DNA evidence. Thus, this claim is rejected.
(3) Motion for mistrial and Crim.R. 29 motion
{¶ 156} Clinton argues that the trial court erred in denying defense counsel's motion for a mistrial following Detective Clark's testimony regarding Keckler's death. As discussed in relation to proposition of law Nos. III and XI, Clinton's arguments lack merit.
{¶ 157} He also argues that the trial court erred in denying his Crim.R. 29 motion for acquittal at the close of the state's case, because there was insufficient evidence to convict him. But as will be discussed in relation to proposition of law No. XX, the state presented sufficient evidence to support all of his convictions. Thus, this claim is rejected.
d. Tearful spectators departing the courtroom
{¶ 158} Clinton argues that the trial court erred by allowing tearful spectators to leave the courtroom. During the state's presentation of crime-scene photographs, defense counsel objected that "maybe three" tearful spectators left the courtroom and passed "right smack underneath [the prosecutor's] presentation." Defense counsel asked the court whether there was "some way that we cannot have people walking in front of the presentation in the presence of the jury, * * * seeing them upset." The trial court replied: "I would instruct the State of Ohio to advise the victim's advocate, this is going to be probably the most demonstrative evidence of the children, and if they're going to leave the room, they should leave the room before we proceed." Nothing more was said about this matter.
{¶ 159} "The impact of emotional outbursts at trial by witnesses or spectators cannot be judged by an appellate court on a cold record. 'Was the jury disturbed, alarmed, shocked or deeply moved? * * * These questions necessarily depend on facts which no record can reflect.' " (Ellipsis sic.) State v. Hill , 75 Ohio St.3d 195, 204, 661 N.E.2d 1068 (1996), quoting State v. Bradley , 3 Ohio St.2d 38, 40, 209 N.E.2d 215 (1965). Thus, a trial court must determine, as a question of fact, whether an emotional outburst deprived the defendant of a fair trial.
*37 State v. Scott , 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133, ¶ 44. "In the absence of *451 clear, affirmative evidence to the contrary, the trial court's determination will not be disturbed." State v. Morales , 32 Ohio St.3d 252, 255, 513 N.E.2d 267 (1987).
{¶ 160} Clinton argues that the sight of tearful spectators leaving the courtroom was extremely prejudicial. He asserts that the trial court failed to take appropriate corrective action and should have instructed the jury to ignore what it had seen. But defense counsel did not request a corrective instruction. Moreover, the trial court directed the prosecutor to advise the victim's advocate to talk with the spectators (presumably family members) and ensure that future interruptions did not occur. It would be speculative to find prejudice on this record. We reject this claim.
e. Omissions during voir dire
{¶ 161} Clinton argues that the trial court made several errors during voir dire. He argues that the trial court erred by failing to conduct additional voir dire of the jurors following prospective juror No. 363's remark that he had heard that Clinton had admitted his guilt. But as discussed in relation to proposition of law No. VIII, nothing in the record demonstrates that prospective juror No. 363's remark biased or prejudiced the empaneled jurors. Thus, this claim is rejected.
{¶ 162} Finally, Clinton argues that the trial court erred when it failed to voir dire the jurors on the issue of race, because Clinton is African American and was charged with murdering three white victims.
{¶ 163} In Turner v. Murray , 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986), the United States Supreme Court held that a "capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias," id. at 36-37, 106 S.Ct. 1683. However, "a defendant cannot complain of a judge's failure to question the venire on racial prejudice unless the defendant has specifically requested such an inquiry." Id. at 37. Turner noted that the actual decision to question on racial prejudice is a choice best left to a capital defendant's counsel. If counsel declines to request voir dire on the subject of racial prejudice, the trial court need not broach the topic sua sponte. Id. at 37, fn. 10, 106 S.Ct. 1683 ; State v. Conway , 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 33. Clinton did not request voir dire on the subject of racial prejudice. Thus, the trial court did not err by failing to inquire about the subject of race.
D. Trial Issues
{¶ 164} In proposition of law No. XX, Clinton challenges the sufficiency and manifest weight of the evidence for his convictions for (1) the aggravated murders of Jackson, C.J., and W.J., (2) the rape of C.J. and E.S., and (3) the aggravated burglary of Jackson's home.
*452 {¶ 165} A claim challenging the sufficiency of the evidence invokes a due-process concern and raises the question whether the evidence is legally sufficient to support the jury verdict as a matter of law. State v. Thompkins , 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In reviewing such a challenge, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks , 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
*38 {¶ 166} A claim that a jury verdict is against the manifest weight of the evidence involves a different test. " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " Thompkins at 387, 678 N.E.2d 541, quoting State v. Martin , 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).
1. Aggravated Murders
{¶ 167} Clinton argues that the state presented insufficient evidence to show that he killed Jackson, C.J., and W.J. This claim lacks merit.
{¶ 168} Evidence showed that during the early morning of September 8, 2012, Clinton phoned Jackson. Shortly thereafter, surveillance cameras from nearby Firelands Hospital captured Clinton's Cadillac arriving at her home. He stayed a little more than one hour before departing. He returned a few minutes later and left again a minute and a half later.
{¶ 169} Jackson and her two children were found dead in their residence on the evening of September 8. During a police interview, Clinton admitted having been at Jackson's residence and having had sex with her on the morning of September 8. But he denied having killed Jackson or her children. On September 11, 2012, in a recorded phone conversation from the county jail, Clinton said to his mother, "Look at all the people I hurt, and * * * I can't even explain it." He added, "I'm going to go in there and plead guilty or whatever, and just let them do whatever."
{¶ 170} The autopsies showed that Jackson, C.J., and W.J. died from ligature strangulation. Dr. Scala-Barnett stated that Jackson's rectum was dilated, indicating that something had likely been inserted into it at or about the time of her death. She testified that C.J.'s underwear was "rolled" up, indicating that it was *453 likely she had been re-dressed. Dr. Scala-Barnett also testified that C.J.'s rectum was dilated and that that injury occurred at "or about the time of death."
{¶ 171} Testing identified DNA consistent with Clinton's on the anal swab from C.J. and on the stained portion of her underwear that contained at least one sperm cell. The DNA profiles obtained from the ligatures on C.J. and W.J. were also consistent with contributions from Clinton. Also the DNA profile from the swab of Jackson's right wrist was a mixture consistent with contributions from Clinton.
{¶ 172} Nevertheless, Clinton argues that the evidence was insufficient to convict him of these murders. He argues that the state's witnesses indicated a possible drug motive behind the Jackson murders and that several persons were considered suspects prior to Clinton's arrest. Clinton notes that a window on the west side of the home was unlocked and could have been entered by someone not seen on the surveillance cameras. However, these arguments overlook all of the evidence described above. Moreover, surveillance footage and cell-phone records placed Clinton at the scene of the offenses at the time they occurred. Thus, there is no plausible culprit for the murders and rape except Clinton.
{¶ 173} Clinton also argues that investigators ignored the evidence that DNA from unknown male contributors was *39 found on the victims. The BCI laboratory report shows that DNA from "at least one unknown male" was found on the left wrist, right ankle, and shoulder of Jackson. In addition, the minor Y-chromosome DNA profile from an unknown male was found on both of W.J.'s wrists (the major Y-chromosome DNA profile was W.J.'s). However, only DNA consistent with the victims' and Clinton's was found on the anal swab obtained from C.J., her underwear, and the ligatures around C.J.'s and W.J.'s necks.
{¶ 174} In addition, Clinton argues that other evidence was not tested for DNA, including a cigarette butt found inside the closet where the children were discovered and hairs found on C.J.'s body. Defense counsel mentioned these omissions during closing arguments. Thus, the jury knew of these discrepancies, but reasonably decided to accept the testimony of the state's witnesses. See State v. Drummond , 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 202.
{¶ 175} A review of the entire record shows that the testimony, circumstantial and forensic evidence, and Clinton's own statements provided sufficient evidence to prove beyond a reasonable doubt that he was guilty of the three aggravated murders.
{¶ 176} With respect to Clinton's manifest-weight challenge, he argues that the credibility of the state's witnesses, particularly Hanson and Dan Risner, was questionable. However, this argument is not convincing. Even if there were questions about the credibility of some state witnesses, this is not " 'the exceptional case in which the evidence weighs heavily against the conviction.' "
*454 Thompkins , 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting Martin , 20 Ohio App.3d at 175, 485 N.E.2d 717. Given the strength of the evidence, we find that the jury neither lost its way nor created a miscarriage of justice in convicting Clinton of the aggravated murders.
2. Rape of C.J. and E.S.
{¶ 177} Clinton argues that there was insufficient evidence to prove that he raped C.J. or E.S. However, DNA consistent with Clinton's was found on the anal swab from C.J. and the stained area on her underwear that contained at least one sperm cell. Dr. Scala-Barnett testified that C.J.'s rectum was dilated. She also stated that C.J.'s underwear was "rolled" up, indicating that the body had "most likely been" re-dressed.
{¶ 178} Clinton disputes Dr. Scala-Barnett's conclusion that C.J. was raped, arguing that she found no injuries-no tearing or bruising-in C.J.'s rectal area. He argues that although Dr. Scala-Barnett testified that C.J.'s rectum was dilated, the jury never saw a photograph of C.J.'s dilated rectum. Thus, he argues, no foundation was established for Dr. Scala-Barnett's conclusion. But it was not necessary to present a photograph of C.J.'s rectum to establish that she had been raped.
{¶ 179} Clinton also challenges the certainty of the test results identifying DNA consistent with his on the anal swabs from C.J. and the stain in C.J.'s underwear. Clinton argues that because the samples were consumed during BCI testing, he will never have the opportunity to retest the DNA evidence. However, "questions regarding the reliability of DNA evidence in a given case go to the weight of the evidence rather than its admissibility." State v. Pierce , 64 Ohio St.3d 490, 501, 597 N.E.2d 107 (1992). Expert testimony established that Clinton's DNA profile and his male-specific Y-chromosome profile were consistent with the DNA profile and Y-chromosome profile found on the anal swabs. Moreover, Garofalo testified that *40 "[t]he combined expected frequency of occurrence of these DNA profiles on the anal swabs is one in 120,094,500 unrelated individuals."
{¶ 180} The evidence was also sufficient to establish beyond a reasonable doubt that Clinton raped E.S. She testified that Clinton choked her and forced her to have vaginal intercourse while they were alone in his apartment. Dettling observed redness on her neck that was consistent with E.S.'s statement that she had been choked. A DNA profile consistent with Clinton's was identified on vaginal and anal swabs obtained from E.S.
{¶ 181} Clinton argues that the testimony was insufficient to convict him because it rested solely on the credibility of E.S. But it is improper to evaluate a witness's credibility on review of evidentiary sufficiency.
*455 Lang , 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, at ¶ 224. Thus, there is sufficient evidence to support Clinton's convictions for the rape of C.J. and E.S.
{¶ 182} Clinton also argues that the rape convictions are against the manifest weight of the evidence. He asserts that the credibility of the state's witnesses, particularly E.S. and Dr. Scala-Barnett, is questionable. But Clinton points to no substantial evidence to support these claims. This is not " 'the exceptional case in which the evidence weighs heavily against the conviction.' " Thompkins , 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting Martin , 20 Ohio App.3d at 175, 485 N.E.2d 717. The evidence of Clinton's guilt was overwhelming. The jury neither lost its way nor created a miscarriage of justice in convicting Clinton for the rapes of C.J. and E.S.
3. Aggravated Burglary
{¶ 183} Cell-phone records, surveillance tapes, and other evidence show that Clinton entered Jackson's house on the morning of September 8, 2012. Clinton then strangled Jackson, C.J., and W.J., and raped C.J.
{¶ 184} Clinton argues that there is insufficient evidence to establish that he committed an aggravated burglary, because some evidence indicates that Jackson invited him into her home. However, "a defendant who initially gains entry to one's home by consent may subsequently become a trespasser if consent is withdrawn. [And] * * * a jury could justifiably infer from the facts that a victim terminated the accused's privilege to remain after commencement of an assault." State v. Holloway , 38 Ohio St.3d 239, 243, 527 N.E.2d 831 (1988), citing State v. Steffen , 31 Ohio St.3d 111, 509 N.E.2d 383 (1987).
{¶ 185} Even assuming that Clinton's initial entry was lawful, the jury was justified in inferring from the evidence that Clinton's privilege to remain in Jackson's residence terminated the moment he began assaulting her and her children. Thus, there was sufficient evidence to prove beyond a reasonable doubt that Clinton was guilty of aggravated burglary. And because nothing shows that the jury lost its way or created a miscarriage of justice in convicting him of this offense, Clinton's manifest-weight claim also fails.
{¶ 186} Based on the foregoing, we reject proposition of law No. XX.
4. Penalty-Phase Issues
{¶ 187} In proposition of law No. I, Clinton argues that the trial court erred by failing to conduct a hearing to ensure that his waiver of the presentation of mitigating evidence was knowing and voluntary.
a. Facts
{¶ 188} Before the start of the penalty phase, defense counsel informed the court *41 that Clinton had instructed his counsel not to present any mitigating *456 evidence or to make opening or closing statements. Counsel added that Clinton planned "to make an unsworn statement" and twice stated that Clinton was not waiving all mitigation.
{¶ 189} Defense counsel also informed the court that the defense neuropsychologist, Dr. Galit Askenazi, had conducted a competency evaluation. Based on her findings, Dr. Askenazi opined "with reasonable psychological certainty, that Mr. Clinton is able to understanding [sic] the nature and objectives of the mitigation phase and to knowingly choose to waive mitigation at the present time."
{¶ 190} In addition, defense counsel stated, "[I]t's my belief that he is hoping to get the death penalty. It's also my belief, so the record is clear, the basis for this is due to the conviction of the offenses against the children. He believes he will be much safer on death row than [in with the] general population. There's more reason, but that's the general."
{¶ 191} Finally, defense counsel said, "[W]e've gone over with him every aspect of it, and I think his knowledge of the penalty phase is probably better than a lot of lawyers in the state at this time. So we're very comfortable with his knowledge." Counsel stated, "We tried to get him to go forward and let us attempt to ask for a sentence of less than death, but he's made it very clear and instructed us on, we aren't to do that." Defense counsel added that his defense team was preparing all available mitigating evidence "in case he changes his mind."
{¶ 192} During the penalty phase, Clinton presented a lengthy unsworn statement. Following Clinton's unsworn statement, the defense rested. Defense counsel stated: "We are not putting on any witnesses. This is Mr. Clinton's choice. We have a full case available. We have the summaries of all that they would have said, including expert opinion * * * but Mr. Clinton has advised us it's his desire that we don't." Defense counsel then submitted to the court under seal mitigating evidence that defense investigators had prepared on Clinton's behalf.
b. Principles of law
{¶ 193} In State v. Ashworth , 85 Ohio St.3d 56, 706 N.E.2d 1231 (1999), paragraph one of the syllabus, we held: "In a capital case, when a defendant wishes to waive the presentation of all mitigating evidence, a trial court must conduct an inquiry of the defendant on the record to determine whether the waiver is knowing and voluntary." (Emphasis sic.) As part of the inquiry, the trial court must determine "whether the defendant understands his or her rights both in the plea process and in the sentencing proceedings." Id. at 62, 706 N.E.2d 1231.
{¶ 194} The "[p]resentation of any mitigating evidence during either the guilt phase or the penalty phase of a capital-murder trial relieves the trial court of the *457 duty to conduct an Ashworth inquiry." State v. Barton , 108 Ohio St.3d 402, 2006-Ohio-1324, 844 N.E.2d 307, paragraph two of the syllabus. And an Ashworth inquiry is not required when a defendant makes an unsworn statement but presents no other evidence in mitigation. State v. Roberts , 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, ¶ 143. As we stated, "Our emphasis in Ashworth was to require an inquiry of 'a defendant only in those situations where the defendant chooses to present no mitigating evidence whatsoever.' " (Emphasis added in Roberts .) Id. , quoting State v. Monroe , 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 74.
c. Analysis
{¶ 195} The trial court did not err by failing to conduct an Ashworth inquiry after *42 Clinton instructed his counsel not to present any mitigating evidence on his behalf. Clinton presented a lengthy unsworn statement, and this excused the trial court from the duty of conducting such an inquiry.
{¶ 196} Clinton argues that an Ashworth inquiry was required because his unsworn statement contained nothing that was mitigating. This is not supported by the record. Regardless of how Clinton characterizes it, he did in fact present mitigating evidence in his unsworn statement. He explained his behavior on the night of the murders, his prior relationship with Jackson and her children, the depression he experienced, and the jobs he had held and lost.
{¶ 197} Clinton argues that the trial court was required to question him personally to ensure that defense counsel had accurately conveyed his decision to waive mitigation and his reasons for doing so. Yet the right to present mitigating evidence is not a fundamental right that must be personally waived by the defendant. See State v. Short , 129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶ 59. Moreover, the United States Supreme Court has "never imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce evidence" and "never required a specific colloquy to ensure that a defendant knowingly and intentionally refused to present mitigating evidence." Schriro v. Landrigan , 550 U.S. 465, 479, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007).
{¶ 198} Clinton also claims that his failure to knowingly and voluntarily waive mitigation constituted structural error. Structural errors are constitutional defects that " 'defy analysis by "harmless error" standards' because they 'affect[ ] the framework within which the trial proceeds, rather than simply [being] an error in the trial process itself.' " (Brackets sic.) State v. Fisher , 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 9, quoting Arizona v. Fulminante , 499 U.S. 279, 309-310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Here, there is no constitutional defect triggering a structural-error analysis. Moreover, Clinton presented mitigating evidence in his unsworn statement. Thus, neither error nor structural error occurred.
*458 {¶ 199} We also reject Clinton's claim that defense counsel were "cavalier" in not presenting other mitigating evidence on his behalf. Counsel had a neuropsychologist evaluate Clinton to ensure that he was competent to make a decision regarding mitigation. In addition, defense counsel prepared mitigating evidence, including expert testimony, to present if Clinton changed his mind about presenting additional mitigating evidence.
E. Other Issues
1. Absence from Hearings
{¶ 200} In proposition of law No. II, Clinton argues that his absence during two court hearings violated his due-process rights.
a. Legal principles
{¶ 201} A defendant has a Fourteenth Amendment due-process right to be present at every critical stage of his trial. Snyder v. Massachusetts , 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934) ; see also Section 10, Article I, Ohio Constitution ; Crim.R. 43(A). An accused's absence, however, does not necessarily result in prejudicial or constitutional error. "[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only. " (Emphasis added.) Snyder at 107-108, 54 S.Ct. 330. See *43 United States v. Gagnon , 470 U.S. 522, 527, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985) (under certain circumstances, a defendant's absence from a hearing at which his counsel are present does not offend due process); Kentucky v. Stincer , 482 U.S. 730, 746, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987) (no due-process or Confrontation Clause violation when an accused was excluded from a hearing on the competency of two child witnesses). See also State v. Williams , 6 Ohio St.3d 281, 285-286, 452 N.E.2d 1323 (1983) (absence from hearings can be harmless error).
b. Factual background
{¶ 202} During voir dire on October 9, 2013, Clinton expressed his desire not to remain in court. The trial court urged Clinton to remain in court and assist his attorneys. Defense counsel conferred with Clinton and stated, "Based on your assurances, he has indicated that he would come tomorrow and will let us know if he changes his mind * * *."
{¶ 203} During voir dire on October 16, 2013, Clinton stated that he did not want to remain in court because of his frustrations with the procedure and the prosecutor. The trial court told him, "I'd rather have you stay. It's your right to be here." Clinton responded, "The only time I get to say something is when I'll show up." The trial court said, "[T]his is your trial and you need to be present."
*459 {¶ 204} Clinton was absent during an in-chambers conference on October 28, 2013. Defense counsel informed the court:
MR. DOUGHTEN: Your Honor, just as far as him not-Curtis not being here, * * * we have-all three of us have sat down and told Curtis that, at every meaningful step of trial, he is permitted to be there, including these conferences.
He has indicated to us he did not want to be there. In fact, he had told us, at one time, he didn't even want to come out until it was time for him to testify.
We were able to talk to him about the importance of being here for the voir dire and for the trial and, as of right now, he's good with this. But he's made it crystal clear that he did not want to be at these sessions, and I just want the record clear that we specifically addressed that with him on multiple occasions.
THE COURT: Thank you. Thank you, Mr. Doughten.
And I take it he would be waiving his presence at any bench conference, as well?
MR. DOUGHTEN: Yes, yes. That's not an issue at all.
{¶ 205} At a hearing outside the jury's presence on November 1, 2013, defense counsel explained Clinton's absence:
MR. DOUGHTEN: We met with him yesterday. He had specifically requested not to come over. We explained to him what we were doing; we're going through the evidence and the jury instructions. He said he absolutely did not want to be here.
So that we indicated he could be here for, actually, the [ Crim.R. 29 ] arguments, but for this, he requested not to.
And both Mr. Dixon and myself, and I should add, Ms. Kendall, are satisfied that we've explained it thoroughly and there was no need for him to be here. We discussed this with him before we came in.
*44 So we would waive his presence, Your Honor.
{¶ 206} During the remainder of that hearing, the trial court ruled on objections to the state's exhibits related to Keckler and E.S. Clinton was present, however, for the Crim.R. 29 motion and the rest of that day's proceedings.
*460 {¶ 207} At a November 7 hearing (as discussed in proposition of law No. II), defense counsel informed the court that Clinton had instructed them not to present any mitigation. Defense counsel added: "[H]e's indicated he does not want to come to court for any reason, except * * * to give his statement, and he asked us to convey to the Court that he doesn't want to be moved."[1]
{¶ 208} Clinton argues that defense counsel's waiver of his presence at the hearings on November 1 and 7, 2013, was insufficient.
c. Analysis
{¶ 209} The November 1 hearing was a short proceeding, involving objections to a few of the state's exhibits. During the November 7 hearing, penalty-phase instructions, a motion limiting the scope of the prosecutor's final argument, a renewed motion to prohibit victim-impact evidence and the readmission of trial-phase evidence, and the waiver of mitigating evidence were addressed.
{¶ 210} Clinton argues that he had to personally waive his presence at these hearings, but he is incorrect. See Gagnon , 470 U.S. at 528, 105 S.Ct. 1482, 84 L.Ed.2d 486 (trial court "need not get an express 'on the record' waiver from the defendant for every trial conference which a defendant may have a right to attend"); Hale , 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, at ¶ 103. Moreover, during earlier proceedings, Clinton and defense counsel informed the court that he did not want to attend all the hearings and conferences. Thus, Clinton's absence was consistent with his stated wishes. See Treesh , 90 Ohio St.3d at 489, 739 N.E.2d 749.
{¶ 211} Clinton's absence from the two hearings was also not prejudicial because the jury received neither testimony nor evidence and no critical stage of the trial was involved. See State v. Frazier , 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 145 ; State v. Brinkley , 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 123. The hearings mostly involved legal issues within the professional competence of counsel, not issues that the defendant must personally decide. See McKnight , 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, at ¶ 215 ; White , 82 Ohio St.3d at 26, 693 N.E.2d 772 (defendant's absence during hearing on proposed jury instructions did not deny him a fair trial).
{¶ 212} Clinton contends that his presence on November 1 would have alerted him that his counsel was providing ineffective assistance as to the admission of irrelevant, cumulative, and prejudicial photographs. But this speculative claim lacks merit, because nothing shows that counsel were ineffective during this hearing. See Hale at ¶ 102. Clinton also argues that his presence on November 7 would have made him aware of counsel's ineffectiveness as to his involuntary and *461 unknowing waiver of the presentation of mitigating evidence. However, Dr. Askenazi's competency evaluation reported that Clinton "wanted to waive mitigation." Thus, this argument lacks merit.
{¶ 213} Finally, Clinton asserts that the verdict forms and jury questionnaires were discussed off the record and outside his *45 presence. Because no record was made, we cannot determine whether he was absent from the discussions in question. See Hale , 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, at ¶ 105. He also claims that his absence was prejudicial because he cannot assist counsel to re-create the record on appeal. But Clinton fails to explain how the record is incomplete, because the verdict forms and questionnaires are in the record. Thus, Clinton fails to show he was prejudiced, and this claim is rejected.
2. Disruptive Behavior by the Victims' Family
{¶ 214} In proposition of law No. XII, Clinton argues that he was denied a fair trial when the trial court failed to take curative action following courtroom disruptions caused by the victims' family.
a. Factual background
(1) Individual voir dire proceedings
{¶ 215} During individual voir dire, defense counsel stated that Jackson's brother and at least one other family member were wearing "victim impact type" shirts in the courtroom. The trial court told the family members that they could not wear the shirts in the courtroom but said that instead of being forced to leave for the day, they could turn the shirts inside out. At the same time, defense counsel requested that the court ask Jackson's brother not to glare in Clinton's direction in the jurors' presence. The trial court responded, "I certainly understand that, and I've asked [Jackson's brother] to off the record."
{¶ 216} At a later session that day, defense counsel stated: "I should note that, when the Court indicated to [Jackson's brother] that he couldn't wear the T-shirt, * * * he literally stood up in the courtroom and took off the shirt and turned it inside-out and put it back on." Defense counsel added that when Jackson's brother started glaring at Clinton, Clinton said, " 'I don't want to be in here. I don't want to be subjected to this.' "
(2) Sentencing
{¶ 217} Following the trial court's imposition of the death sentences, E.S. and several of the victims' family members addressed the court. Jackson's brother was the last person to speak. He launched into a verbal tirade against Clinton, calling him a "worthless piece of shit" and indicated that Clinton should be glad to be on death row because if he were in the general prison population, Jackson's brother's friends, who apparently are also in prison, would "get" Clinton.
*462 Jackson's brother concluded, "If I got my way, they still will. Sleep with an eye open * * *."
{¶ 218} Clinton was provided an opportunity to speak before sentencing on the noncapital offenses. He said: "[Jackson's brother] can kiss my ass." An altercation then took place in the courtroom. Clinton and Jackson's brother exchanged profanity-laced threats, and there appears to have been some pushing and shoving. After the deputies restored order, the trial court imposed sentence on the noncapital offenses.
b. Analysis
{¶ 219} Clinton argues that the trial court erred by failing to conduct a Remmer hearing, because Jackson's brother was glaring at Clinton and wearing a T-shirt with the victims' names during individual voir dire. See Remmer v. United States , 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954) (defendant is entitled to a hearing to determine the effect that a remark made to a juror during trial and the investigation into that remark had on the jury). Clinton claims that such conduct was prejudicial because prospective juror No. 70, who was later selected to sit on the jury, was being questioned on the morning of Jackson's brother's disruptive behavior.
*46 {¶ 220} In Bradley, 3 Ohio St.2d 38, 209 N.E.2d 215, at syllabus, we considered the effect of an emotional outburst from a victim's family member during a capital trial:
Whether an emotional demonstration in the courtroom during the course of a murder trial by a spectator related to the victim improperly influences the jury against the accused * * * so as to deprive the accused of a fair trial [is a question] of fact to be resolved by the trial court, whose determination thereon will not be disturbed on review in the absence of evidence contrary to that determination clearly and affirmatively appearing on the face of the record.
{¶ 221} Jackson's brother's behavior occurred during individual voir dire. However, the trial court took corrective action to ensure that Jackson's brother's behavior did not continue. Defense counsel's failure to challenge prospective juror No. 70 or any other prospective juror based upon Jackson's brother's behavior indicates that the defense was satisfied with the trial court's corrective action. Thus, it would be speculative to conclude that Clinton was denied a fair trial. See McKnight , 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, at ¶ 204.
{¶ 222} Clinton claims that Jackson's brother did not abide by the trial court's admonitions, but the record does not support this assertion.
*463 {¶ 223} Clinton also indicates that he waived mitigation partly because he would feel safer on death row, because of his fear of Jackson's brother. But as mentioned previously, Clinton was actually concerned about inmates in the general prison population harming him because of his convictions for the offenses involving children.
{¶ 224} We also reject Clinton's argument that the trial court was required to conduct a Remmer hearing to determine the effect of Jackson's brother's behavior upon the jurors. A Remmer hearing must be held when the trial court learns of "private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury." 347 U.S. at 229, 74 S.Ct. 450, 98 L.Ed. 654.
{¶ 225} However, "[w]here the communication is innocuous and initiated by a spectator in the form of an outburst, a hearing is not necessarily required." White v. Smith , 984 F.2d 163, 166 (6th Cir.1993). An in-court emotional demonstration directed at the defendant is "quite unlike the private communication with the jury encountered in Remmer ." Whitehead v. Cowan , 263 F.3d 708, 724 (7th Cir.2001). Jackson's brother's conduct occurred before a jury was empaneled, and it is unclear whether prospective juror No. 70 or any other prospective juror even observed these events. Under these circumstances, a Remmer hearing was unnecessary. See Johnson , 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, at ¶ 254 and 263-264 ( Remmer hearing not required after spectator shouted a threat at the defendant).
{¶ 226} Finally, we reject Clinton's claim that he was prejudiced by Jackson's brother's outburst during sentencing, because these events occurred after the jury had been discharged. See McKnight , 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, at ¶ 205.
{¶ 227} Based on the foregoing, we reject proposition of law No. XII.
*47 3. Prosecutorial Misconduct
{¶ 228} In proposition of law No. XVII, Clinton argues that there were numerous instances of prosecutorial misconduct during various phases of trial. When reviewing a claim of prosecutorial misconduct, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " Darden v. Wainwright , 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), quoting Donnelly v. DeChristoforo , 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). To answer that question, we consider whether the conduct was improper and whether it prejudicially affected the defendant's substantial rights. State v. Maxwell , 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 243. In evaluating prejudice, we *464 review the effect of the misconduct "on the jury in the context of the entire trial." State v. Keenan , 66 Ohio St.3d 402, 410, 613 N.E.2d 203 (1993).
a. Failure to notify the defense that evidence sample would be consumed by DNA test, victim-impact testimony, and other-acts evidence
{¶ 229} Clinton recasts several of his previous arguments into claims of prosecutorial misconduct. First, he repeats his argument from proposition of law No. V that the prosecutor violated the ABA standards by authorizing BCI analysts to perform DNA tests that would consume the evidence being tested without first notifying the defense. But we determined that the failure was not plain error, and Clinton has not otherwise provided sufficient evidence to support his prosecutorial-misconduct claim. Thus, this argument is rejected.
{¶ 230} Second, he argues that the prosecutor introduced victim-impact evidence, citing the testimony addressed in proposition of law No. XV. But none of this evidence constituted victim-impact evidence except testimony that E.S. was involved in counseling. But that testimony was not prejudicial, because it was brief and "not overly emotional or directed to the penalty to be imposed." Lang , 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, at ¶ 237. Similarly, no misconduct occurred in eliciting the testimony.
{¶ 231} Clinton also argues that the prosecutor committed misconduct in introducing other-acts evidence relating to E.S.'s rape and Keckler's strangulation. However, as discussed in response to Clinton's proposition of law No. IV, Clinton was properly charged with E.S.'s rape. And as discussed in response to Clinton's proposition of law No. III, evidence of Keckler's strangulation was properly admitted as "other acts" evidence under Evid.R. 404(B). No prosecutorial misconduct occurred.
b. Presenting inflammatory photographs
{¶ 232} Clinton argues that the prosecutor committed misconduct by presenting gruesome and repetitive photographs. Here, he repeats similar claims raised in proposition of law No. IX. With the exception of the readmission of two autopsy photographs during the penalty phase, Clinton failed to object and waived all but plain error. Clinton did not establish that admitting these photographs resulted in error or plain error. Thus, we address only Clinton's challenge to the additional photographs.
{¶ 233} Clinton objects to the introduction of multiple autopsy and crime-scene photos. Each of the autopsy photos depicted the victim's injuries and supported Dr. Scala-Barnett's testimony about the autopsy results. See State v. Trimble , 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 148. Each of the *48 challenged crime-scene photos illustrated the testimony of the investigating police officers. Although some of the photos were gruesome, all were probative of *465 Clinton's intent and the nature and circumstances of the crime. See State v. Cunningham , 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, ¶ 61. And the photos were not cumulative.
{¶ 234} For these reasons, the challenged photographs were properly admitted. Therefore, the prosecutor's introduction of this evidence cannot form the basis for a misconduct claim. See Mammone , 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, at ¶ 116.
c. Closing arguments
{¶ 235} Clinton argues that the prosecutor committed misconduct during his guilt-phase closing argument. Specifically, Clinton argues that the prosecutor improperly denigrated the defense. "It is improper to denigrate defense counsel in the jury's presence." State v. Davis , 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 304.
{¶ 236} First, he complains that the prosecutor argued, "Now, implicit in the cross-examination is, * * * they-you know, and it's natural, trying to, as I say, kind of dirty up the victim." After the trial court sustained an objection, the prosecutor continued, "Implicit in the cross-examination is to question Heather Jackson's lifestyle."
{¶ 237} The prosecutor's initial comment that "it's natural, trying to * * * dirty up the victim" denigrated defense counsel. But the trial court sustained the defense's objection to these comments. The prosecutor's second comment eliminated the offending remarks and was proper. In any event, any errors were corrected by the trial court's instructions that counsel's arguments were not evidence and the jury was the sole judge of the facts. See Lang , 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, at ¶ 163.
4. Imposition of Court Costs
{¶ 238} In proposition of law No. XVIII, Clinton argues that the trial court's imposition of court costs violates the spirit of the Eighth Amendment to the United States Constitution. However, defense counsel did not object to the imposition of court costs at trial.
{¶ 239} This court has held that R.C. 2947.23 requires a trial court to assess costs against all criminal defendants, even if the defendant is indigent. State v. White , 103 Ohio St.3d 580, 2004-Ohio-5989, 817 N.E.2d 393, ¶ 8. The costs may be waived, but "[a] motion by an indigent criminal defendant for waiver of payment of costs must be made at the time of sentencing." State v. Threatt , 108 Ohio St.3d 277, 2006-Ohio-905, 843 N.E.2d 164, paragraph two of the syllabus. Otherwise, the issue is waived and costs are res judicata. Id. at ¶ 23. Defense counsel's failure to object in this case constitutes waiver.
*466 {¶ 240} Clinton argues that imposing court costs on indigent defendants violates the spirit of the Eighth Amendment. This is incorrect. "[C]osts are not punishment, but are more akin to a civil judgment for money." Threatt at ¶ 15. Clinton's Eighth Amendment argument lacks merit, and proposition of law No. XVIII is rejected.
5. Compliance with R.C. 2929.11
{¶ 241} In proposition of law No. XXI, Clinton argues that the trial court failed to comply with the requirements of R.C. 2929.11 when sentencing him. These provisions provide that a court "shall be guided by the overriding purposes of felony sentencing" when sentencing an offender convicted of a felony, describe those purposes, *49 including deterrence and rehabilitation, and further state that the term of the sentence should be the minimum necessary to achieve those purposes without imposing an unnecessary burden on government resources. R.C. 2929.11(A).
{¶ 242} Clinton claims that the trial court did not comply with R.C. 2929.11. The record belies this claim. Before pronouncing sentence, the trial court stated, "The Court will state for the record that it's cognizant of the overriding purposes and principles of felony sentencing here in Ohio. The Court does adhere to those purpose[s] and principles, as it must, pursuant to 2929.11(A), (B), and (C) of the Ohio Revised Code."
{¶ 243} Clinton also argues that the trial court never made detailed findings to comply with R.C. 2929.11. Yet a trial court "fulfills its duty under the statutes by indicating that it has considered the relevant sentencing factors." State v. Smith , 8th Dist. Cuyahoga No. 100206, 2014-Ohio-1520, 2014 WL 1408284, ¶ 14. The court "need not go through each factor on the record-it is sufficient that the court acknowledges that it has complied with its statutory duty to consider the factors without further elaboration."Id. In fact, consideration of the appropriate factors set forth in R.C. 2929.11 can be presumed unless the defendant affirmatively shows to the contrary. State v. Davis , 8th Dist. Cuyahoga No. 104221, 2016-Ohio-7964, 2016 WL 7074945, ¶ 35. Thus, this claim lacks merit.
{¶ 244} Proposition of law No. XXI is rejected.
6. Constitutionality
{¶ 245} In proposition of law No. XXII, Clinton challenges the constitutionality of Ohio's death-penalty statutes and claims that they violate international laws and treaties to which the United States is a party. These claims are summarily rejected. See Dean , 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, at ¶ 298.
*467 7. Cumulative Error
{¶ 246} In proposition of law No. XXIII, Clinton argues that his convictions and sentence should be reversed on the grounds of cumulative error.
{¶ 247} Under the doctrine of cumulative error, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." State v. Powell , 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, at ¶ 223.
{¶ 248} Although errors occurred at Clinton's trial, none of them rose to the level of reversible error. But errors "cannot become prejudicial by sheer weight of numbers." Hill , 75 Ohio St.3d at 212, 661 N.E.2d 1068. And the record shows that the cumulative effect of these errors did not deprive Clinton of a fair trial in light of the significant evidence against him. Proposition of law No. XXIII is rejected.
8. Appropriateness and Reliability of the Death Sentences
{¶ 249} In proposition of law No. XIX, Clinton argues that the sentences of death were unreliable and inappropriate. This claim invokes R.C. 2929.05(A), which requires that we "review and independently weigh all of the facts and other evidence disclosed in the record in the case and consider the offense and the offender to determine whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors in the case." (Emphasis added.)
{¶ 250} As noted above, Clinton made an unsworn statement but otherwise submitted no mitigation evidence. Defense *50 counsel also submitted to the court under seal information showing that defense investigators had conducted a thorough investigation into Clinton's background. This information included summaries of interviews with Clinton, Clinton's mother, two of his siblings, two of his aunts, one of his cousins, and three of his female friends; a timeline of significant events in Clinton's life that had been prepared by Clinton's defense team; Clinton's GED certificate; Erie County Department of Job and Family Services records; and Clinton's mental-health records. Dr. Askenazi's competency-to-waive-mitigation report was also included as part of the submitted information.
{¶ 251} Clinton contends that the mitigating information under seal should be considered during our independent sentence evaluation. He argues that this information provides substantial mitigation about his history and background that we are obliged to consider.
{¶ 252} The state argues that neither the Ohio statutory scheme nor the Eighth Amendment entitles a capital defendant to have this court during its independent reweighing consider mitigating evidence that the defendant chose to *468 withhold from the jury. Clinton's mitigating information was not presented to the jury or considered by the trial court in its sentencing opinion. See R.C. 2929.03(F). The state argues that in order for a defendant's mitigating evidence to be considered by an appellate court, the evidence must first be presented to the jury so that its veracity can be tested through cross-examination and the state can present rebuttal evidence.
{¶ 253} The question becomes whether the mitigating information must be considered under R.C. 2929.05(A) because it constitutes "facts and other evidence disclosed in the record." Defense counsel's stated purpose for submitting the mitigating information was to "make the record clear" that Clinton was voluntarily waiving mitigation and that if Clinton changed his mind, his defense team was ready to present mitigating evidence. Counsel added, "[W]e would like to present this and, frankly, put it under seal, because much of the information is really not for public consumption. One of the bases for * * * Curtis not to present it is he didn't want the family dysfunction to be put out for the public record."
{¶ 254} We have held that "[t]he independent weighing process at each appellate level required by R.C. 2929.05 does not contravene the role of the jury in the penalty proceeding; rather, the statutory scheme provides a procedural safeguard against the arbitrary imposition of the death penalty." Holloway , 38 Ohio St.3d 239, 527 N.E.2d 831, at paragraph two of the syllabus. Clinton deliberately chose to present only his unsworn statement in mitigation after being fully advised of his rights to present mitigating evidence in his behalf. Moreover, none of the witness statements submitted under seal have been signed. They are summaries prepared by the defense team, submitted simply to show that the defense had thoroughly investigated Clinton's mitigation. We hold that these statements do not qualify as "facts and other evidence disclosed in the record" that we are obliged to consider under R.C. 2929.05(A). (Emphasis added.)
{¶ 255} Dr. Askenazi's competency report is a different matter. It is part of the record and was not filed under seal. Defense counsel submitted this report to demonstrate Clinton's competency to waive mitigation. This report reviews Clinton's family, educational, occupational, medical, substance-abuse, psychiatric/psychological, and legal history. We have considered similar evaluations in other cases. See *51 State v. Mink , 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064 (competency evaluations considered during independent sentence evaluation); State v. Obermiller , 147 Ohio St.3d 175, 2016-Ohio-1594, 63 N.E.3d 93 (same). Accordingly, it is appropriate to consider Dr. Askenazi's competency report and the mitigating evidence contained therein, during our independent sentence evaluation.
{¶ 256} Clinton's other arguments as to the appropriateness of the death penalty will also be considered during our independent sentence evaluation.
*469 IV. Independent Sentence Evaluation
{¶ 257} Having considered Clinton's propositions of law, we must now independently review Clinton's death sentences for appropriateness and proportionality as R.C. 2929.05(A) requires.
{¶ 258} Before the start of the penalty phase, the two aggravated-murder counts with regard to C.J. were merged and the two aggravated-murder counts with regard to W.J. were merged. The state proceeded with Count Three (murder during an aggravated burglary) as to Jackson, Count Five (purposely causing the death of a child under 13) as to C.J., and Count Eight (purposely causing the death of a child under 13) as to W.J.
A. Aggravating Circumstances
{¶ 259} Clinton was convicted of two death specifications as to Count Three and three death specifications each as to Counts Five and Eight. The jury found that Clinton killed all three victims as "part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons," R.C. 2929.04(A)(5), and that he had committed the aggravated murders while committing rape, R.C. 2929.04(A)(7). As to C.J. and W.J., the jury also found a violation of R.C. 2929.04(A)(9), murdering a child under the age of 13.
{¶ 260} First, the evidence at trial supports Clinton's conviction under R.C. 2929.04(A)(5) and (A)(7) with respect to each of the three counts of aggravated murder. On the same day that Clinton drove to Jackson's home and stayed for a little more than an hour, the bodies of Jackson and her two children were found dead inside their home.
{¶ 261} Surveillance videos, cell-phone records, Clinton's police statement, and other forensic evidence linked Clinton to the murders. The killings were directly linked in time and location. See State v. Sapp , 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, syllabus and ¶ 52 (factors such as time, location, a common scheme, or a common psychological thread can establish the factual link necessary to prove a course of conduct). Further, autopsy results showed that C.J.'s rectum was dilated and that the injury occurred at "or about the time of death." Testing also identified DNA consistent with Clinton's on the anal swabs from C.J., the stain in C.J.'s underwear that contained at least one sperm cell, Jackson's wrist, and the ligature around W.J.'s neck.
{¶ 262} Finally, evidence was presented that C.J. was three years old and W.J. was one year old at the time of their deaths. Thus, the evidence supports Clinton's conviction under R.C. 2929.04(A)(9) for these two counts of aggravated murder.
*470 B. Mitigating Evidence
{¶ 263} Against these aggravating circumstances, we must weigh the mitigating factors contained in R.C. 2929.04(B). Clinton made a lengthy unsworn statement and a statement in allocution. We also consider the mitigating evidence contained in Dr. Askenazi's competency evaluation.
*52 1. Clinton's Unsworn Statement
{¶ 264} In his unsworn statement, Clinton discounted the DNA results that identified a DNA profile consistent with his on C.J., stating: "[I]t says that I can't be excluded. Never said it was me. That I cannot be excluded. * * * That's what they're saying." Clinton made a similar point with regard to the DNA profile found on Jackson's right wrist. He emphasized, "Mr. Baxter [the prosecutor] said it's my DNA, and on this paper, it says * * * that I cannot be excluded, period. Doesn't say it's mine. Had never, never ever said it's mine."
{¶ 265} Clinton also discussed the night of the murders, stating: "I was over there that night, I had sex with Heather that night, and I left that night. There was a video that you guys seen. * * * [I]t's just not even clear. You can't really see it. * * * This is my first time ever over at this house. Ever, ever, ever." He added that he had gone to Jackson's house to give her money and they had had sex, but said he did not know how long he had been there. After he left, he said, he remembered that he had left a cigar at the house and returned for a minute or two to pick it up. He claimed that someone else must have come over after he left the second time.
{¶ 266} Clinton said that he had suffered from deep depression after being fired from three jobs. He said, "Instead of them telling me, and being men and telling me that, 'Okay. Because [of] your past conviction, we don't want you here,' they lied and [said], 'You're too slow.' "
{¶ 267} Clinton said that it hurt him to be accused of these crimes: "I think, out [of] this whole situation, what bothers me the most, I've never spanked my kids, I've never beat my kids, I've never disrespected my kids or anybody else's kids." He added, "[F]or somebody to say that I'd rape a kid, kill a kid, beat a-the whole circumstance is beyond this. * * * And Heather's-she's-was a friend and it hurts, but it's the kid factor. * * * I think that hurts the most."
{¶ 268} Clinton complained about the state's failure to test hairs collected during the autopsies: "I think you guys looked at that hair. * * * I seen it up on video, but I know it's not African-American hair." He also complained that the state's testing of some of the evidence for DNA consumed the entire sample, stating: "That's like, if we have one doctor in the whole world, we all have to go to him and respect his finding. We can't go nowhere else and have another opinion."
*471 He added, "I'm facing the death penalty * * * and I have nothing to fight. I have to go by this lady's opinion."
{¶ 269} He challenged the prosecutor's honesty stating, "He took and told you guys that Mr. Clinton's DNA was found in the rectum of [C.J.]. I mean, he lied. He lied to you guys. Misled you guys into believing that my semen was in this little baby's rectum. * * * It is not true."
{¶ 270} He also accused Hanson and Risner of lying about how they got into the house the day they found Jackson's body. He speculated that Hanson had "wiped down stuff" in the house, and he said that Risner had admitted to doing so. Clinton also questioned why they had not immediately called the police after finding Jackson's body.
{¶ 271} He then stated, "I'm very sorry for this family's loss, but * * * I didn't do this. * * * I wish * * * I would have been a lot more cautious, but I don't regret * * * being here and doing what I did for her." He added, "I've known her since April. * * * I've been to her house in Huron * * *. Stayed with her two days out there. I think, when she lost her apartment-I'm *53 not sure, but I know we stayed in hotels." Clinton further explained their relationship:
She stayed with me and-first, it was her and her daughter. They stayed like a week. * * * Then her son stayed, I think a day, maybe, at my apartment.
It wasn't an everyday thing that me and Heather seen each other. * * * It was friendship. She's borrowed money from me countless times. She's paid it back.
{¶ 272} Next, Clinton said he would get a new trial: "But rest assured that the concerns I have addressed to you guys today, they will be addressed. I will have a new trial, however it may be. Because what you don't see, somebody else is going to see." He also alluded to his reasons for not testifying: "He [the prosecutor] tried to bait me to the stand. I'm not going to defend-I already done time. * * * I'm not going to sit up here and defend that again. That's double jeopardy. Why would I do that? That's stupid."
2. Clinton's Statement in Allocution
{¶ 273} Before sentencing, Clinton presented a final statement to the court, stating that he had no faith in the proceedings, did not respect the prosecutor, and would appeal.
3. Dr. Askenazi's Evaluation
{¶ 274} Dr. Askenazi's evaluation also contained extensive mitigating evidence.
*472 {¶ 275} Clinton was born on April 24, 1971. He lived with his father and stepmother from the age of 7 to 14. There were eight children in the house, and Clinton told Dr. Askenazi that there had not been sufficient room, food, or privacy. He was raised Baptist, but at age 23, he became a Muslim.
{¶ 276} Clinton reported that his father had inflicted extensive physical, emotional, and mental abuse on the children, including beatings with belts, a bullwhip, boards, and anything else his father could find. Clinton said that he and his brothers held each other down during the beatings. The children had also been forced to engage in sexual acts, including having sex with their stepsister. Clinton said that his father had sexually abused all the children in the house, but he did not provide more specific information.
{¶ 277} According to Clinton, he was 14 when a children-services agency placed him with his aunt. He eventually ran away and was placed with his mother. He also spent time in two juvenile-detention centers. Clinton reported that he was abused terribly at the centers, stating, " 'That's where I gained the majority of anger towards people.' " Dr. Askenazi stated, "He also developed severe distrust of people, both within and outside the family, from the experiences he had as a child, which persists to the present day."
{¶ 278} Clinton has never been married but has three children, two sons and a daughter, who at the time of Dr. Askenazi's report, in November 2013, were teenagers. When he was arrested for the present offenses, he was in a relationship with Mercedes Charlton.
{¶ 279} Dr. Askenazi reported that her review of Clinton's records show that he completed nine years of schooling, although he spent three years in ninth grade. His grades ranged from B through F. He described himself as the "class clown," and he received several suspensions for disruptive behavior and fighting. While in prison, Clinton obtained his GED, took music and business classes, and earned a Home Building Institute certificate.
*54 {¶ 280} Clinton said that most of his work experience has been with cooking and factory jobs. While in prison from 1999 to 2012, he served as a "runner," helping with paperwork for the warden, and "held jobs as a clerk, in the kitchen, and on the yard crew." After he was released from prison in 2012, he held jobs in restaurants and on an assembly line.
{¶ 281} Clinton reported that he has experienced "blackouts" since the age of nine, usually when he was fighting or angry. Clinton stated that blackouts occurred when " '[s]omebody done something identical to something my dad done, or somebody in my family.' " He directly attributed the blackouts to his childhood, stating, " 'I got abused so much-you separate yourself, it works for you, you go with it.' " In December 2012, Clinton reported to Dr. Askenazi that his last *473 blackout occurred " 'one week before the events leading to his current criminal charges.' "
{¶ 282} He reported that he has suffered from depression since childhood and has attempted to commit suicide on multiple occasions. He began receiving psychological treatment at the age of 15. He received mental-health treatment from 1997 through 2010 during periods of incarceration. In 2009, Clinton was diagnosed with posttraumatic stress disorder secondary to childhood abuse and recurrent major depressive disorder. At that time, Clinton reported a history of 15 suicide attempts.
{¶ 283} Dr. Askenazi stated that Dr. David Oleski, a psychologist at Richland Correctional Institution, had treated Clinton. In May 2006, Oleski wrote: " '[Clinton] described his experience of becoming angry and "going off" on another person as if he was "disconnecting with himself." He claims when he explodes into an angry outburst, he does not always remember what he does. * * * [Clinton] conveyed that when he goes off in his state of rage, he hurts people and feels no guilt or regret at the time, and * * * can dial up that disconnect of guilt at almost any time.' " (Ellipses sic.) In July 2006, Oleski noted, " 'He talked about having 3 personalities, the real him who can go out of control at anytime, the person he created to accept the abuse from his father, and another person who puts on a front for people.' "
{¶ 284} Clinton acknowledged a history of significant alcohol consumption but denied any history of drug abuse. As a juvenile, he was confined in multiple detention homes. According to Dr. Askenazi, Clinton's records show a history of charges involving receiving stolen property, corruption of a minor, domestic violence, aggravated menacing, and carrying a concealed weapon.
{¶ 285} In 1999, Clinton was found guilty of involuntary manslaughter in relation to Keckler's death and was sentenced to ten years in prison. He was also convicted of two counts of assaulting a guard in jail and was sentenced to two consecutive 18-month terms. He was released from prison on February 4, 2012.
{¶ 286} Dr. Askenazi administered tests to measure Clinton's neuropsychological status. The Wechsler Adult Intelligence Scale showed a full-scale IQ of 96, falling within the average range. The Repeatable Battery for the Assessment of Neuropsychological Status placed his broad cognitive abilities, including attention and memory, in the "broadly average range."
{¶ 287} Due to Clinton's report of blackouts, Dr. Askenazi administered the Dissociative Experience Scale. The doctor reported:
On this measure, [Clinton] reported a high level of certain dissociative *55 experiences, including not being fully aware of what people are saying, not *474 remembering what has happened during certain periods of time and sometimes finding evidence that he has done something he does not remember, not knowing how he arrived at a given location, being accused of lying when he does not think he has lied, [and] derealization (i.e., feeling that the world around him is not real).
{¶ 288} Dr. Askenazi found no evidence of intellectual or cognitive impairment. However, she made the following diagnoses per the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders: (1) major depressive disorder, with anxious distress, recurrent, in full remission, (2) posttraumatic stress disorder, with dissociative symptoms, in remission, and (3) borderline-personality disorder, with antisocial features.
C. Sentence Evaluation
{¶ 289} Nothing in the nature and the circumstances of the offenses is mitigating. Clinton strangled Jackson, three-year-old C.J., and one-year-old W.J. Forensic evidence also established that Clinton raped C.J. These are horrific crimes that lack any mitigating features.
{¶ 290} As discussed above, Clinton made an unsworn statement and a statement in allocution but otherwise waived the presentation of mitigating evidence. Review of his unsworn statement, allocution, and Dr. Askenazi's report shows that he presented little that was mitigating.
{¶ 291} The statutory mitigating factors under R.C. 2929.04(B) include R.C. 2929.04(B)(1) (victim inducement), (B)(2) (duress, coercion, or strong provocation), (B)(3) (mental disease or defect), (B)(4) (youth of the offender), (B)(5) (lack of a significant history of prior criminal convictions and delinquency adjudications), (B)(6) (accomplice only), and (B)(7) (any other relevant factors). Review of the evidence shows that none of these statutory factors is applicable except R.C. 2929.04(B)(7).
{¶ 292} In his unsworn statement, Clinton expressed sorrow for the deaths. He also maintained his innocence, thus denying responsibility for the murders. Clinton's denials negate the mitigating weight that this court might otherwise give to his expression of sorrow. See Maxwell , 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, at ¶ 282 ; State v. Hunter , 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 205.
{¶ 293} Evidence was also presented showing that Clinton had been employed. Mitigating weight under R.C. 2929.04(B)(7) should be given to this factor. See State v. Pickens , 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 253.
{¶ 294} Dr. Askenazi's evaluation discloses that Clinton was raised in a dysfunctional household, where physical and emotional abuse were prevalent. His *475 father beat him with belts, a bullwhip, and whatever else was available. Clinton and his siblings were also forced to engage in sexual activity with his stepsister. Thus, Clinton's background and upbringing is entitled to significant weight. See Powell , 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, at ¶ 276. However, we have "seldom given decisive weight" to this factor. See Hale , 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, at ¶ 265.
{¶ 295} Clinton spent time in two juvenile-detention centers. He dropped out of school after the ninth grade but later obtained his GED. He acknowledged significant problems with alcohol consumption.
{¶ 296} Clinton also has a history of mental-health problems. He has experien *56 ced blackouts since the age of nine and has attempted suicide on multiple occasions. Clinton's IQ of 96 falls within the normal range, and there is no evidence of intellectual or cognitive impairment. Yet he has been diagnosed with a major depressive disorder, posttraumatic stress disorder, and borderline-personality disorder. We give weight to Clinton's personality disorders and other mental-health problems under R.C. 2929.04(B)(7). See State v. Neyland , 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 300 ; State v. Hoffner , 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 118.
{¶ 297} We conclude that the aggravating circumstances as to each aggravated-murder count clearly outweigh the mitigating factors beyond a reasonable doubt. With respect to Jackson's murder, the course-of-conduct and the aggravated-murder-during-rape (related to the rape of C.J.) specifications strongly outweigh the mitigating factors. The three specifications that apply to C.J.'s and W.J.'s murders-course of conduct, murder during a rape, and child murder-overwhelm the mitigating factors. In particular, the R.C. 2929.04(A)(9) specification is entitled to great weight because it involves the murder of young and vulnerable victims. See Pickens , 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, at ¶ 256.
{¶ 298} As a final matter, we conclude that the death sentences imposed in this case are appropriate and proportionate to death sentences upheld in similar cases. We have previously upheld death sentences for a course of conduct under R.C. 2929.04(A)(5). See Pickens at ¶ 257 ; Trimble , 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, at ¶ 329 ; State v. Gapen , 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 182. We have also upheld the death sentence as punishment for other child murders under R.C. 2929.04(A)(9). See Mammone , 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, at ¶ 241 ; Powell , 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, at ¶ 284 ; Hunter , 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, at ¶ 206. Finally, we have upheld the death penalty as punishment for aggravated murder during a rape under R.C. 2929.04(A)(7). See *476 State v. Lynch , 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 196 ; State v. Phillips , 74 Ohio St.3d 72, 106, 656 N.E.2d 643 (1995).
V. Conclusion
{¶ 299} For the foregoing reasons, we affirm the judgments of conviction and the death sentences.
Judgment affirmed.
O'Donnell, Kennedy, French, Fischer, and DeWine, JJ., concur.
O'Neill, J., concurs in part and dissents in part for the reasons set forth in his dissenting opinions in State v. Wogenstahl, 134 Ohio St.3d 1437, 2013-Ohio-164, 981 N.E.2d 900, and State v. Neyland, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112.

Clinton was present during the penalty-phase proceedings.